## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| L. JAY AGNES, derivatively on Behalf of FANNIE MAE a/k/a Federal National Mortgage Association and its shareholders and individually, <br>     c/o Richard D. Greenfield <br>     780 3rd Avenue, 48th Floor <br>     New York, NY 10017 <br><br>         Plaintiff, <br><br>         v. <br><br> FRANKLIN D. RAINES, J. TIMOTHY HOWARD, DANIEL H. MUDD, ROBERT J. LEVIN, MICHAEL J. WILLIAMS, THOMAS A. LUND, PETER S. NICULESCU, WILLIAM B. SENHAUSER, KENNETH J. BACON, LINDA K. KNIGHT, ROBERT T. BLAKELY, DAVID C. HISEY, STEPHEN M. SWAD, LEANNE SPENCER, STEPHEN B. ASHLEY, H. PATRICK SWYGERT, JOE K. PICKETT, LESLIE RAHL, JOHN K. WULFF, GREG C. SMITH, BRIDGET A. MACASKILL, DENNIS R. BERESFORD, BRENDA J. GAINES, KAREN N. HORN, LOUIS J. FREEH, FREDERIC V. MALEK, JOHN C. SITES, JR., THOMAS P. GERRITY, KENNETH M. DUBERSTEIN, ANNE M. MULCAHY, WASHINGTON MUTUAL, INC., KERRY K. KILLINGER, FIRST AMERICAN CORP., FIRST AMERICAN EAPPRAISEIT, ANTHONY R. MERLO, JR., COUNTRYWIDE FINANCIAL CORP., COUNTRYWIDE HOME EQUITY LOAN TRUST, COUNTRYWIDE BANK, FSB, COUNTRYWIDE HOME LOANS, INC., LANDSAFE, INC., ANGELO R. MOZILO, and GOLDMAN SACHS GROUP, INC., <br><br>         Defendants, <br><br>         and | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

FANNIE MAE a/k/a Federal National Mortgage      )
Association,                                     )
                                                )
        Nominal Defendant.                )

## COMPLAINT

### THE NATURE OF THE CASE

     1.     Plaintiff, L. Jay Agnes, a shareholder of Fannie Mae ("Fannie Mae" or

"the Company"), brings this derivative action on behalf of the Company and its shareholders

against certain current and former officers and directors of Fannie Mae and third parties to

remedy two different, but substantively related, courses of wrongful conduct that have cost

Fannie Mae billions of dollars and will continue to impact negatively on its financial and

operating condition, its reputation, and its goodwill long into the future: (a) breaches of

fiduciary duty and other illegal accounting manipulations, and the concealment thereof,

occurring from approximately 1998 through 2004 ("Pre-2005 Claims"); and (b) during the

period thereafter and continuing to the present, the massive mismanagement of the

Company, breaches of fiduciary duty, waste of the Company's assets, and deliberate

concealment of such wrongful conduct manifested in the Company's reckless investment

and participation in the subprime financing of home mortgages under the leadership and

purported oversight of the defendant officers and directors ("Subprime Claims"). Plaintiff

also brings this action in his individual capacity as a shareholder of Fannie Mae against the

members of its Board of Directors on April 4, 2008, the date of the dissemination of the

Company's 2008 Proxy Statement ("Proxy Claims").

2.      The Pre-2005 Claims are brought against various officers and directors of the Company, Raines, Howard, Mudd, Spencer, Ashley, Duberstein, Malek, Mulcahy, and Swygert (the "Pre-2005 Defendants") and against Defendant Goldman Sachs Group, Inc.

3.      The Subprime Claims are brought against various officers and directors of the Company, Mudd, Levin, Williams, Lund, Niculescu, Senhauser, Bacon, Knight, Blakely, Hisey, Swad, Ashley, Swygert, Pickett, Rahl, Wulff, Smith, Macaskill, Beresford, Gaines, Horn, Freeh, Sites, Gerrity, and Duberstein (the "Subprime Defendants"), and against defendants Washington Mutual, Inc., Killinger, First American Corp., First American eAppraiseIt, Merlo, Countrywide Financial Corp., Countrywide Home Equity Land Trust, Countrywide Bank, FSB, Countrywide Home Loans, Inc., Landsafe, Inc., and Mozilo ("Subprime Facilitators").

### PRE-2005 CLAIMS

4.      As a result of the pre-2005 breaches of fiduciary duty and other illegal accounting manipulations described below, the Company lost an estimated $10.6 billion, expended over $1 billion to recreate and correct historical financial documents, incurred massive expenses for legal and expert fees, and suffered substantial losses of goodwill. As a result of the wrongful conduct of the Pre-2005 Defendants, Fannie Mae has paid a $400 million civil monetary penalty to the Office of Federal Housing Enterprise Oversight ("OFHEO") and the Securities and Exchange Commission ("SEC") and agreed to implement certain costly remedial measures which, as post-2004 events have demonstrated, have largely failed to protect Fannie Mae and its shareholders from substantial damages. The Pre-2005 Defendants' illegal actions have also caused the Company to be named as a

defendant in massive securities fraud and ERISA class actions, as well as in other, individual securities fraud actions as a direct result of the wrongdoing described herein, all of which has exposed Fannie Mae to additional billions of dollars in damages. Finally, this scandal has caused the Company's stock price to plummet, causing Fannie Mae to lose over $31 billion in valuable market capitalization through 2005 and weakened its credit ratings as well as its reputation. Since late 2005, when Fannie Mae's top management was replaced, current management led by defendant Mudd, has replayed the earlier wrongdoing and subjected the Company to a new round of litigation and claims by investors and, as well, upon information and belief, a new round of investigations.

5.        At bottom, the Pre-2005 Defendants' illegal financial manipulations were animated by former management's unbounded greed – artificially inflating their annual bonuses and other compensation of senior executives that was linked to the Company's reported (as distinct from actual) earnings per share ("EPS"). Senior management manipulated Fannie Mae's accounting to falsely reach EPS targets so as to reap staggering, undeserved bonuses for themselves and their confederates. For example, over $52 million of defendant Raines' compensation of $90 million during this period was directly the result of "achieving" EPS targets (while his actual salary for the period totaled $6.5 million).

6.        Pre-2005 Defendants' wrongful conduct arose in part from an arrogance borne of the special status and privileges of Fannie Mae, being a privately owned and managed, yet federally chartered, corporation. As defendant Mudd observed, "We used to, by virtue of our peculiarity, be able to write, or have written, rules that worked for us." Rules that "worked" for the defendants, as opposed to the Company, allowed them to "cook

4

the books" – to manipulate earnings figures and ignore Generally Accepted Accounting Principles ("GAAP") – in order to astronomically increase executive bonuses. Those ill-gotten millions are particularly offensive because they stand in stark contrast to the fundamental purpose of Fannie Mae – to facilitate the financing of affordable housing for low- and middle-income families.

      7.       In sum, as OFHEO reported in May 2006:

- "Fannie Mae senior management promoted an image of the [Company] as one of the lowest-risk financial institutions in the world and as "best in class" in terms of risk management, financial reporting, internal control, and corporate governance. The findings in this report show that risks at Fannie Mae were greatly understated and that the image was false."

- "During the period … 1998 to mid-2004 … Fannie Mae reported extremely smooth profit growth and hit announced targets for earnings per share precisely each quarter. Those achievements were illusions deliberately and systematically created by the [Company's] senior management with the aid of inappropriate accounting and improper earnings management."

- "A large number of Fannie Mae's accounting policies and practices did not comply with GAAP. The [Company] also had serious problems of internal control, financial reporting, and corporate governance. Those errors resulted in Fannie Mae overstating reported income and capital by a currently estimated $10.6 billion."

- "By deliberately and intentionally manipulating accounting to hit earnings targets, senior management maximized the bonuses and other executive compensation they received, at the expense of shareholders."

- "Fannie Mae's Board of Directors contributed to those problems by failing to be sufficiently informed and to act independently of its chairman, Franklin Raines, and other senior executives; by failing to exercise the requisite oversight over the [Company's] operations; and by failing to discover or ensure the correction of a wide variety of unsafe and unsound practices."

- "The Board's failures continued in the wake of revelations of accounting problems and improper earnings management at Freddie Mac and other high profile firms, the initiation of OFHEO's special examination, and credible allegations of improper earnings management made by an employee of the [Company's] Office of the Controller."

### SUBPRIME CLAIMS

8.      Under the Subprime Defendants' direction, Fannie Mae's senior management virtually ignored responsible risk management, engaged in highly speculative real estate transactions, and never disclosed the full extent of its exposure to the subprime mortgage crisis. In fact, the Company merely issued monthly reports concerning the gross value of its mortgage portfolio. Although Fannie Mae eventually disclosed that $47.2 billion of its portfolio consisted of securities backed by subprime loans, the Company emphasized deceptively that $46.9 billion of those securities were rated AAA.

6

9.     As a result of the Subprime Defendants' reckless management of the Company, and their failure to undertake corrective action, and disclose Fannie Mae's true operating and financial condition, the truth concerning Fannie Mae's exposure has yet to be revealed fully and only partial disclosures began to be made on November 9, 2007.  On that day, Fannie Mae and the Subprime Defendants disclosed that the Company's earnings for the first three quarters of fiscal 2007 had declined by over $2 billion due to subprime mortgage-related transactions.  This trend continued when Fannie Mae reported a staggering net loss of $2.1 billion for the 2007 fiscal year and a further loss of $2.2 billion for the first quarter of 2008. Analysts have estimated that Fannie Mae could well be facing cumulative credit losses of over $50 billion before this debacle reaches its end.  As more fully alleged below, the Subprime Facilitators, operating under the lax and/or non-existent underwriting standards the Subprime Defendants permitted to be prevalent at Fannie Mae, took undue advantage of the Company and improperly caused it to incur billions of dollars in damages.

10.     Compounding the financial catastrophe into which the Subprime Defendants have piloted Fannie Mae is the fact while future major losses surely await the Company – the pace in subprime mortgage defaults and foreclosures has not slackened – almost half of the capital on which the Company might rely to help absorb such blows consists of largely illusory "deferred tax assets" and "Lower Income Housing Tax Credit partnerships," which have value largely as an offset to income and are not, in fact, tangible assets of any value in Fannie Mae's current circumstances.

11.     While the Subprime Defendants were causing Fannie Mae to conceal its exposure to the subprime market crisis it was enduring, they were also wasting the Company's

7

assets by causing it to repurchase over $2.6 billion worth of its own shares at prices which the Subprime Defendants knew or should have known were inflated. Even worse, certain of the Subprime Defendants sold their personally held shares while in possession of material non-public information for over $13 million in proceeds.

12.    As a result of the Subprime Defendants waste of corporate assets and breaches of duty generally, Fannie Mae's credibility with investors has been devastated. Between May, 2006 and the present, the Company's market value declined from over $69 per share to less than $30 per share as of April 1, 2008 – a $38.1 billion market capitalization loss. The Company's reported value of net assets dropped from $35.8 billion at the beginning of 2008 to $12.2 billion by the end of the first quarter, an amount which remains overstated to a material degree. Fannie Mae's mark-to-market losses (losses realized when the value of holdings are adjusted for current market conditions) rose from $3.4 billion in the fourth quarter of 2007 to $4.4 billion in the first quarter of 2008, an amount likely further understated.

13.    At the heart of the Company's financial "meltdown," the latest Fannie Mae scandal is a reckless, if not a callous, betrayal of the Company's core mission and the people this "government-sponsored enterprise" was intended to serve. The purpose of Fannie Mae's operations is to encourage home ownership, especially by low- and middle-income families. It is supposed to achieve this purpose by increasing the amount of capital available to lenders through its activities in the secondary mortgage market. When Fannie Mae's Board and senior management recklessly abandoned prudent underwriting standards for the loans the Company purchased, or turned a blind eye to the corruption of the home appraisal process, home buyers

8

were allowed to purchase houses far beyond their economic reach.  Moreover, the availability of such easy mortgage money allowed sellers to increase artificially the prices of their properties far higher than a market undistorted by such easy credit would allow.  For example, THE WASHINGTON POST of March 22, 2008 reported the case of one family in Alexandria, Virginia, which in August 2005 paid "$430,000 for a run-down, one-story duplex in Alexandria, triple what the house had sold for the year before, and $5,000 more than the asking price."  The subprime loan on that house cost the family $3,000 per month, more than 70 percent of the $4,200 monthly income of the family.  By March 2007, that home was in foreclosure.

14.    This is what the Subprime Defendants and Facilitators have wrought – in their hands, the bright hope of homeownership Fannie Mae was intended to extend has become a cruel seduction into financial calamity from which only the slick operators in the marketplace have profited.

### PROXY CLAIMS

15.    In addition to the claims asserted derivatively, this is a shareholder's action brought by plaintiff in his individual capacity against Fannie Mae's directors on April 4, 2008 (the "2008 Directors"), in connection with the preparation, issuance and dissemination of the Company's 2008 Proxy Statement ("Proxy Statement"), which was intentionally false, misleading and in violation of §14(a) of the Exchange Act and Rule 14a-9 promulgated by the SEC.  Such violations harmed the suffrage rights of plaintiff and other Fannie Mae shareholders who were entitled to vote at the Company's 2008 Annual Meeting of Shareholders held on May 20, 2008.

9

16.     The 2008 Directors – defendants Mudd, Ashley, Beresford, Freeh, Gaines, Horn, Macaskill, Rahl, Sites, Smith, Swygert and Wulff – used their control over Fannie Mae and its corporate suffrage process to violate, or aid and abet violations of §14 (a) of the Securities Exchange Act of 1934 and Rule 14a-9 in order to perpetuate themselves in office as Directors of Fannie Mae, thereby permitting them to unjustly enrich themselves and otherwise damage Fannie Mae at its expense and the expense of its shareholders. The Proxy Statement at issue deceptively concealed material facts bearing acutely on the re-election of the 2008 Directors and their governance of Fannie Mae and failed to disclose the widespread and illegal activities carried out by defendant Mudd, the senior management of the Company, and their subordinates which demonstrated the failure of the 2008 Directors in fulfilling their fiduciary duties. The Proxy Statement concealed neutral and non-pejorative facts that would demonstrate, *inter alia,* the breach of the 2008 Directors' obligations as directors and their gross mismanagement of the Company while in their stewardship.  By concealing such facts, the Proxy Statement became a tool used by the 2008 Directors to be re-elected and enable them to remain in control of Fannie Mae.

<u>**JURISDICTION AND VENUE**</u>

17.     The claims asserted by plaintiff herein arise under and pursuant to common law and Section 14(a) of the Exchange Act and SEC Rule 14a-9.

18.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because plaintiff asserts claims for violations of § 14(a) of the Exchange Act and SEC Rule

14a-9. This Court also has jurisdiction over the subject matter of this action pursuant to 12 U.S.C. § 1452(f), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

19.     This action was not brought collusively to confer jurisdiction on a court of the United States that would not otherwise have jurisdiction.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things, many of the acts alleged and complained of herein occurred in this District and Fannie Mae's headquarters are located within this District.

21.     Plaintiff brings this action individually on his own behalf and derivatively on behalf of nominal defendant Fannie Mae and its shareholders.  No claims are asserted against Fannie Mae.  Plaintiff will adequately and fairly represent the interests of Fannie Mae and its shareholders in enforcing and prosecuting their rights.

## THE PARTIES

### A.  PLAINTIFF

22.     Plaintiff L. Jay Agnes is a citizen of the Commonwealth of Pennsylvania who owns and has owned common stock of Fannie Mae at all times relevant hereto.

### B.  NOMINAL DEFENDANT

23.     Nominal defendant Fannie Mae is a federally chartered corporation originally established in 1938.  The Company became a stockholder-owned and privately managed corporation in 1968.  Fannie Mae is in the business of purchasing mortgages from banks and mortgage lenders in the secondary mortgage market and thereby providing additional liquidity for those banks and lenders.  Its principal place of business is located at 3900 Wisconsin Avenue, N.W., Washington, D.C.

11

## C. OFFICER DEFENDANTS

24.    Defendant Franklin D. Raines served as Chairman of Fannie Mae and its Chief Executive Officer ("CEO") from January 1999 until his resignation on December 21, 2004. At various times during 1999 to 2003, defendant Raines, in collusion with defendants Mozilo and Countrywide, obtained below market mortgeges from defendant Countrywide in the amount of approximately $4 million. Because of his positions of control over Fannie Mae during 1999 to 2004, defendant Raines knew, or consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, adverse non-public information about the business of Fannie Mae. During such period, defendant Raines participated in the issuance of improper statements concerning the operations of Fannie Mae, including the preparation of false and misleading press releases and SEC filings, and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders.

25.    Defendant J. Timothy Howard was employed by Fannie Mae from 1982 until his resignation in December 2004. He served as Chief Financial Officer of Fannie Mae from 1990 until his resignation and as Executive Vice President from 1990 to May 2003. He was a director from 2003 until his resignation, and served as Vice Chairman from May 2003 until his resignation.

26.    Defendant Daniel H. Mudd ("Mudd") is Fannie Mae's President and Chief Executive Officer ("CEO") and has been since June 2005. Defendant Mudd is also a Fannie Mae director and has been since February 2000. Defendant Mudd was Fannie Mae's Vice Chairman of the Board from February 2000 to June 2005; Interim CEO from December 2004

to June 2005; and Chief Operating Officer from February 2000 to December 2004. Defendant Mudd is Fannie Mae Foundation's Chairman of the Board and has been since June 2005. Defendant Mudd was Fannie Mae Foundation's Interim Chairman of the Board from December 2004 to June 2005 and Vice Chairman from September 2003 to December 2004. Because of his positions, defendant Mudd knew, or consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, adverse non-public information about the business of Fannie Mae. From early 2006 to the present, defendant Mudd participated in the issuance of improper statements concerning the operations of Fannie Mae, including the preparation of the the Proxy Statement, false and misleading press releases and SEC filings and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Mudd received the following compensation:

| Fiscal Year | Salary | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $950,000 | $4,799,057 | $962,112 | $3,500,000 | $932,958 | $136,072 |

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | LTIP Payouts | All Other Compensation |
|---|---|---|---|---|---|---|
| 2005 | $908,121 | $2,591,875 | $9,487,221 | - | - | $155,539 |
| 2004 | $743,895 | - | $5,524,381 | - | - | $63,815 |
| 2003 | $714,063 | $1,288,189 | - | 105,749 | $4,674,015 | $135,989 |
| 2002 | $689,124 | $911,250 | - | 82,918 | $2,339,702 | $64,454 |
| 2001 | $656,429 | $1,083,109 | - | 87,194 | $1,188,846 | $9,732 |

| 2000 | $537,063 | $735,130 | $1,319,533 | 321,295 | $414,090 | $607,848 |

Defendant Mudd sold 42,606 shares of Fannie Mae stock for $2,342,304.24 in proceeds while in possession of material non-public information.

27.    Defendant Robert J. Levin ("Levin") is Fannie Mae's Executive Vice President and Chief Business Officer and has been since November 2005. Defendant Levin was Fannie Mae's Interim Chief Financial Officer ("CFO") from December 2004 to January 2006; Executive Vice President of Housing and Community Development from June 1998 to December 2004; and Executive Vice President-Marketing from June 1990 to June 1998. Because of his positions, defendant Levin knew, or consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, adverse non-public information about the business of Fannie Mae. From early 2006 to the present, defendant Levin participated in the issuance of improper statements concerning the business of Fannie Mae, including the preparation of false and misleading press releases and SEC filings, and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Levin received the following compensation:

| Fiscal Year | Salary | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $750,000 | $2,477,097 | $883,442 | $2,087,250 | $307,078 | $70,710 |

| Fiscal Year | Salary | Bonus | Restricted Stock | Securities Underlying | LTIP Payouts | All Other Compensation |
|---|---|---|---|---|---|---|

14

|      |           |             | Awards      | Options |             |          |
|------|-----------|-------------|-------------|---------|-------------|----------|
| 2005 | $532,624  | $3,014,770  | $3,361,496  | -       | -           | $44,854  |
| 2004 | $495,169  | -           | $2,194,110  | -       | -           | $43,427  |
| 2003 | $471,415  | $663,129    | -           | 73,880  | $1,274,349  | $9,019   |
| 2002 | $428,195  | $520,000    | -           | 63,836  | $443,137    | $8,999   |

28.    Defendant Michael J. Williams ("Williams") is Fannie Mae's Executive Vice President and Chief Operating Officer and has been since November 2005. Defendant Williams was Fannie Mae's Executive Vice President for Regulatory Agreements and Restatement from February 2005 to November 2005; President-Fannie Mae eBusiness from July 2000 to February 2005; and Senior Vice President-e-commerce from July 1999 to July 2000. Defendant Williams held various positions with Fannie Mae's Single-Family and Corporate Information Systems Division from 1991 to July 1999. Because of his positions, defendant Williams knew, or consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, adverse non-public information about the business of Fannie Mae. During the Relevant Period, defendant Williams participated in the issuance of improper statements concerning the operations of Fannie Mae, including the preparation of false and misleading press releases and SEC filings, and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Williams received the following compensation:

| Fiscal Year | Salary | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All other Compensation |
|-------------|--------|-------------------------|---------------|----------------------------------------|-------------------------------------------------------------------------|------------------------|

| | 2006 | $650,000 | $1,808,182 | $701,446 | $1,630,200 | $371,753 | $69,482 |

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | LTIP Payouts | All Other Compensation |
|---|---|---|---|---|---|---|
| 2005 | $532,624 | $3,014,770 | $3,361,496 | - | - | $44,854 |
| 2004 | $495,169 | - | $2,194,110 | - | - | $43,427 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2003 | $471,415 | $663,129 | - | 73,880 | $1,274,349 | $9,019 |
| 2002 | $428,195 | $520,000 | - | 63,836 | $443,137 | $8,999 |

Defendant Williams sold 38,935 shares of Fannie Mae stock for $2,249,433.87 in proceeds while in possession of material non-public information.

   29.  Defendant Thomas A. Lund ("Lund") is Fannie Mae's Executive Vice President— Single Family Mortgage Business and has been since July 2005. Defendant Lund was Fannie Mae's Interim head of Single-Family Mortgage Business from January 2005 to July 2005; Senior Vice President—Chief Acquisitions Office from January 2004 to January 2005; Senior Vice President-Investor Channel from August 2000 to January 2004; Senior Vice President Southwestern Regional Office, Dallas, Texas from July 1996 to July 2000; and Vice President for Marketing from January 1995 to July 1996. Because of his positions, defendant Lund knew, or consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, adverse non-public information about the business of Fannie Mae. From early 2006 to the present, defendant Lund participated in the issuance of improper statements, including the preparation of false and misleading press releases and SEC filings, and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Lund received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | All Other Compensation |
|---|---|---|---|---|
| 2005 | $411,336 | $1,791,900 | $1,724,476 | $26,259 |

Defendant Lund sold 14,032 shares of Fannie Mae stock for $835,702.09 in proceeds while in possession of material non-public information.

30.       Defendant Peter S. Niculescu ("Niculescu") is Fannie Mae's Executive Vice President-Capital Markets and has been since November 2002. Defendant Niculescu was Fannie Mae's Senior Vice President-Portfolio Strategy from March 1999 to November 2002. Because of his positions, defendant Niculescu knew, or consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, adverse non-public information about the business of Fannie Mae. From early 2006 to the present, defendant Niculescu participated in the issuance of improper statements concerning the operations of Fannie Mae, including the preparation of false and misleading press releases and SEC filings, and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Niculescu received the following compensation:

| Fiscal Year | Salary | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $538,188 | $1,388,328 | $533,816 | $1,029,060 | $232,562 | $39,906 |

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | All Other Compensation |
|---|---|---|---|---|
| 2005 | $512,130 | $1,795,154 | $1,797,643 | $36,187 |

Defendant Niculescu sold 12,462 shares of Fannie Mae stock for $678,084.74 in proceeds while in possession of material non-public information.

31.       Defendant William B. Senhauser ("Senhauser") is Fannie Mae's Senior Vice President and Chief Compliance Officer and has been since December 2005. Defendant

18

Senhauser was Fannie Mae's Vice President for Regulatory Agreements and Restatement from October 2004 to December 2005; Vice President for Operating Initiatives from January 2003 to September 2004; and Vice President, Deputy General Counsel from November 2000 to January 2003. Because of his positions, defendant Senhauser knew, or consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, adverse non-public information about the business of Fannie Mae. From early 2006 to the present, defendant Senhauser participated in the issuance of improper statements concerning the operations of Fannie Mae, including the preparation of false and misleading press releases and SEC filings, and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Senhauser sold 10,482 shares of Fannie Mae stock for $630,011.34 in proceeds while in possession of material non-public information.

32.     Defendant Kenneth J. Bacon ("Bacon") is Fannie Mae's Executive Vice President of Housing and Community Development and has been since July 2005. Defendant Bacon was Fannie Mae's Interim Head of Housing and Community Development from January 2005 to July 2005; Senior Vice President-Multifamily Lending and Investment from May 2000 to January 2005; Senior Vice President-American Communities Fund from October 1999 to May 2000; Senior Vice President of the Community Development Capital Corporation from August 1998 to October 1999; and Senior Vice President of Fannie Mae's Northeastern Regional Office in Philadelphia from May 1993 to August 1998. Because of his positions, defendant Bacon knew, or consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, adverse non-public information about the business of Fannie Mae. From early 2006 to the present, Bacon participated in the issuance of improper statements concerning

the operations of Fannie Mae, including the preparation of false and misleading press releases and SEC filings, and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Bacon sold 8,652 shares of Fannie Mae stock for $480,556.90 in proceeds while in possession of material non-public information.

33.    Defendant Linda K. Knight ("Knight") is Fannie Mae's Executive Vice President -Enterprise Operations and has been since April 2007. Defendant Knight was Fannie Mae's Executive Vice President-Capital Markets from March 2006 to April 2007; Senior Vice President and Treasurer from February 1993 to March 2006; Vice President and Assistant Treasurer from November 1986 to February 1993; Director, Treasurer's Office from November 1984 to November 1986; Assistant Director, Treasurer's Office from February 1984 to November 1984; and Senior Market Analyst from August 1982 to February 1984. Because of her positions, defendant Knight knew, or consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, adverse non-public information about the business of Fannie Mae. From early 2006 to the present, defendant Knight participated in the issuance of improper statements concerning the operations of Fannie Mae, including the preparation of false and misleading press releases and SEC filings, and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders. Defendant Knight sold 7,426 shares of Fannie Mae stock for $406,190.63 in proceeds while in possession of material non-public information.

34.    Defendant Robert T. Blakely ("Blakely") is Fannie Mae's Executive Vice President and has been since January 2006. Defendant Blakely was Fannie Mae's CFO from January 2006 to August 2007. Because of his positions, defendant Blakely knew, or

consciously disregarded, was reckless and grossly negligent in not knowing, and should have

known, adverse non-public information about the business of Fannie Mae. From early 2006 to

the present, defendant Blakely participated in the issuance of improper statements concerning

the operations of Fannie Mae, including the preparation of false and misleading press releases

and SEC filings, and approval of other materially deceptive statements made to the press,

securities analysts and Fannie Mae shareholders. Defendant Blakely received the following

compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $587,500 | $926,250 | $3,898,589 | $364,325 | $209,087 | $140,480 |

Defendant Blakely sold 6,315 shares of Fannie Mae stock for $355,950.21 in proceeds while in

possession of material non-public information.

35.     Defendant David C. Hisey ("Hisey") is Fannie Mae's Senior Vice

President and Controller and has been since February 2005. Defendant Hisey was Fannie

Mae's Senior Vice President, Financial Controls and Operations from January 2005 to

February 2005. Because of his positions, defendant Hisey knew, or consciously

disregarded, was reckless and grossly negligent in not knowing, and should have known,

adverse non-public information about the business of Fannie Mae. From early 2006 to the

present, defendant Hisey participated in the issuance of improper statements concerning the

21

operations of Fannie Mae, including the preparation of false and misleading press releases and SEC filings, and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders.  Defendant Hisey sold 2,929 shares of Fannie Mae stock for $166,591.19 in proceeds while in possession of material non-public information.

36.     Defendant Stephen M. Swad ("Swad") is Fannie Mae's Executive Vice President and has been since May 2007.  Defendant Swad is also Fannie Mae's CFO and has been since August 2007.  Swad was Fannie Mae's CFO Designate from May 2007 to August 2007.  Because of his positions, defendant Swad knew, or consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, adverse non-public information about the business of Fannie Mae.  From early 2006 to the present, defendant Swad participated in the issuance of improper statements concerning the operations of Fannie Mae, including the preparation of false and misleading press releases and SEC filings, and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders.

37.     Defendant Leanne Spencer served as Senior Vice President and Controller of Fannie Mae from 1999 until she "stepped down" from those positions on January 17, 2005.  She continued in a non-officer capacity as a Special Advisor for a period thereafter.

### D. DIRECTOR DEFENDANTS

38.     Defendant Stephen B. Ashley ("Ashley") is Fannie Mae's Chairman of the Board and has been since December 2004 and a director and has been since May 1995. Defendant Ashley is a member of Fannie Mae's Audit Committee and Compensation

Committee and has been since 2006. Defendant Ashley is also a member of Fannie Mae's Housing and Community Finance Committee and Risk Policy and Capital Committee and has been since at least 2007. Defendant Ashley is Chairman and CEO of the Ashley Group, a group of commercial and multifamily real estate, brokerage and investment companies and has been since 1995. Defendant Ashley was also Chairman and CEO of Sibley Mortgage Corporation, a commercial, multifamily and single-family mortgage banking firm from 1991 to 1995. Because of his positions and expertise, defendant Ashley knew, or consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, adverse non-public information about the business of Fannie Mae. During his tenure as a director of Fannie Mae, defendant Ashley participated in the issuance of improper statements concerning the operations of Fannie Mae, including the preparation of false and misleading press releases and SEC filings, and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders.

39.    Defendant H. Patrick Swygert ("Swygert") is a Fannie Mae director and has been since January 2000. Defendant Swygert is Chairman of Fannie Mae's Housing and Community Finance Committee and a member of the Risk Policy and Capital Committee and has been since at least 2007. Because of his positions, defendant Swygert knew, or consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, adverse non-public information about the business of Fannie Mae. During his tenure as a director of Fannie Mae, defendant Swygert participated in the issuance of improper statements concerning the operations of Fannie Mae, including the preparation of false and misleading

23

press releases and SEC filings and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders.

40.     Defendant Joe K. Pickett ("Pickett") is a Fannie Mae director and has been since May 1996. Defendant Pickett elected not to stand for re-election at the Company's 2007 Annual Meeting.  Pickett was a member of Fannie Mae's Housing and Community Finance Committee and Risk Policy and Capital Committee and has been since at least 2007.  Because of his positions, defendant Pickett knew, or consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, adverse non-public information about the business of Fannie Mae.  During his tenure as a director of Fannie Mae, defendant Pickett participated in the issuance of improper statements concerning the operations of Fannie Mae, including the preparation of false and misleading press releases and SEC filings, and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders.  Defendant Pickett sold 2,094 shares of Fannie Mae stock for $170,784.24 in proceeds while in possession of material non-public information.

41.     Defendant Leslie Rahl ("Rahl") is a Fannie Mae director and has been since February 2004.  Defendant Rahl is Chairman of Fannie Mae's Risk Policy and Capital Committee and has been since 2006.  Defendant Rahl is also a member of Fannie Mae's Housing and Community Finance Committee and has been since at least 2007.  Rahl is President and founder of Capital Market Risk Advisors, Inc., a financial advisory firm specializing in risk management, hedge funds and capital market strategy.  Because of her positions and expertise, defendant Rahl knew, or consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, the adverse non-public information

about the business of Fannie Mae. During her tenure as a director of Fannie Mae, defendant Rahl participated in the issuance of improper statements concerning the operations of Fannie Mae, including the preparation of false and misleading press releases and SEC filings, and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders.

42.    Defendant John K. Wulff ("Wulff") is a Fannie Mae director and has been since December 2004. Defendant Wulff is a member of Fannie Mae's Audit Committee and has been since 2006. Because of his positions, defendant Wulff knew, or consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, adverse non-public information about the business of Fannie Mae. During his tenure as a director of Fannie Mae, defendant Wulff participated in the issuance of improper statements concerning the operations of Fannie Mae, including the preparation of false and misleading press releases and SEC filings, and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders.

43.    Defendant Greg C. Smith ("Smith") is a Fannie Mae director and has been since April 2005. Defendant Smith is a member of Fannie Mae's Audit Committee and Compensation Committee and has been since 2006. Because of his positions, defendant Smith knew, or consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, adverse non-public information about the business of Fannie Mae. During his tenure as a director of Fannie Mae, defendant Smith participated in the issuance of improper statements concerning the operations of Fannie Mae, including the preparation of

false and misleading press releases and SEC filings, and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders.

44.     Defendant Bridget A. Macaskill ("Macaskill") is a Fannie Mae director and has been since December 2005.   Defendant Macaskill is Chairman of Fannie Mae's Compensation Committee and has been since 2006.  Defendant Macaskill is also the principal of BAM Consulting, LLC, a financial services consulting firm and has been since 2003. Defendant Macaskill, at various times, was Chairman, CEO and President of the Oppenheimer Funds, Inc. from 1991 to 2001.  Because of her positions and expertise, defendant Macaskill knew, or consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, adverse non-public information about the business of Fannie Mae. During her tenure as a director of Fannie Mae, defendant Macaskill participated in the issuance of improper statements concerning the operations of Fannie Mae, including the preparation of false and misleading press releases and SEC filings, and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders.

45.     Defendant Dennis R. Beresford ("Beresford") is a Fannie Mae director and has been since May 2006.   Defendant Beresford is Chairman of Fannie Mae's Audit Committee and has been since 2006.  Defendant Beresford was a member of Fannie Mae's Compensation Committee from May 2006 to July 2007.  Because of his positions, defendant Beresford knew, or consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, adverse non-public information about the business of Fannie Mae. During his tenure as a director of Fannie Mae, defendant Beresford participated

26

in the issuance of improper statements concerning the operations of Fannie Mae, including the preparation of false and misleading press releases and SEC filings, and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders.

46.     Defendant Brenda J. Gaines ("Gaines") is a Fannie Mae director and has been since September 2006.  Defendant Gaines is a member of Fannie Mae's Compensation Committee and Housing and Community Finance Committee and has been since September 2006.  Because of her positions, defendant Gaines knew, or consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, adverse non-public information about the business of Fannie Mae.  During her tenure as a director of Fannie Mae, defendant Gaines participated in the issuance of improper statements concerning the operations of Fannie Mae, including the preparation of false and misleading press releases and SEC filings, and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders.

47.     Defendant Karen N. Horn ("Horn") is a Fannie Mae director and has been since September 2006.  Defendant Horn is a member of Fannie Mae's Audit Committee and Risk Policy and Capital Committee and has been since September 2006.  Defendant Horn is also the senior managing director of Brock Capital Group, LLC, an advisory and investment firm and has been since 2003.  Because of her positions and expertise, defendant Horn knew, or consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, adverse non-public information about the business of Fannie Mae. During her tenure as a director of Fannie Mae, defendant Horn participated in the issuance of improper

statements concerning the operations of Fannie Mae, including the preparation of false and misleading press releases and SEC filings, and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders.

48.    Defendant Louis J. Freeh ("Freeh") is a Fannie Mae director and has been since May 2007. Defendant Freeh is a member of Fannie Mae's Compensation Committee and has been since May 2007. Because of his positions, defendant Freeh knew, or consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, adverse non-public information about the business of Fannie Mae. During his tenure as a director of Fannie Mae, defendant Freeh participated in the issuance of improper statements concerning the operations of Fannie Mae, including the preparation of false and misleading press releases and SEC filings, and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders.

49.    Defendant Frederic V. Malek served as a member of the Board of Fannie Mae from 2002 until his resignation at the end of 2005.

50.    Defendant John C. Sites, Jr. ("Sites") is a Fannie Mae director and has been since October 2007. Defendant Sites is a member of Fannie Mae's Housing and Community Finance Committee and Risk Policy and Capital Committee and has been since 2007. Defendant Sites is also a consultant to Wexford Capital, LLC, an investment advisor, and has been since September 2006. Defendant Sites was a general partner of Daystar Special Situations Fund, a private equity fund from January 1996 to August 2006. Because of his positions and expertise, defendant Sites knew, or consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, adverse non-public information

28

about the business of Fannie Mae. During his tenure as a director of Fannie Mae, defendant Sites participated in the issuance of improper statements concerning the operations of Fannie Mae, including the preparation of false and misleading press releases and SEC filings, and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders.

51.    Defendant Thomas P. Gerrity ("Gerrity") was a Fannie Mae director from 1991 to December 2006. Because of his position, defendant Gerrity knew, or consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, adverse non-public information about the business of Fannie Mae. During his tenure as a director of Fannie Mae, defendant Gerrity participated in the issuance of improper statements concerning the operations of Fannie Mae, including the preparation of false and misleading press releases and SEC filings, and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders.

52.    Defendant Kenneth M. Duberstein ("Duberstein") was a Fannie Mae director from 1998 to February 2007. Because of his position, defendant Duberstein knew, or consciously disregarded, was reckless and grossly negligent in not knowing, and should have known, adverse non-public information about the business of Fannie Mae. During his tenure as a director of Fannie Mae, defendant Duberstein participated in the issuance of improper statements concerning the operations of Fannie Mae, including the preparation of false and misleading press releases and SEC filings, and approval of other materially deceptive statements made to the press, securities analysts and Fannie Mae shareholders.

29

53.     Defendant Anne M. Mulcahy served as a member of the Board of Fannie Mae from 2000 until her resignation on October 19, 2004.

### E. SUBPRIME FACILITATOR DEFENDANTS

54.     Defendant Washington Mutual, Inc., ("WaMu") is the country's largest savings and loan, with reported assets of approximately $346 billion.  WaMu is one of the nation's largest originators of so-called subprime mortgages and the 4th largest provider of loans to Fannie Mae, totaling $7.8 billion in loans in 2007.  At its peak, WaMu operated approximately 350 home loan centers, sales offices and loan processing call centers.  At all relevant times, defendant Kerry K. Killinger ("Killinger") was WaMu's Chairman and Chief Executive Officer and the architect of its plan and scheme to originate and, *inter alia*, sell off to Fannie Mae and others, substantial amounts of subprime and other questionable mortgage loans originated by WaMu.  Defendant Killinger caused WaMu to initiate his plan and scheme in order to rejuvenate WaMu after three years of failing performance and declining per share profits, all of which was caused by poor execution of his exponential growth plans, bad branch locations, and problems with integrating acquisitions.  Upon information and belief, there are presently ongoing criminal and civil investigations of WaMu being conducted by, *inter alia*, the Federal Bureau of Investigation and the Securities & Exchange Commission.  Such investigations are examining mortgage origination fraud, conflicts of interest, and undisclosed relationships with, *inter alia*, appraisers, as well as the practices used to package mortgage-backed securities for sale to investors.

55.     Defendant Countrywide Financial Corporation and its subsidiaries and/or affiliates, defendants Countrywide Home Loans, Inc.  ("CHL"), Countrywide Home Equity

Loan Trust, Countrywide Bank, FSB ("CFSB") (collectively "Countrywide"), is one of the nation's largest originators of subprime and other mortgages and is the largest provider of single-family mortgages to Fannie Mae. In 2007, Countrywide provided 28 percent of Fannie Mae's single-family mortgages. At its peak, Countrywide was the nation's largest residential finance lender, originating more than $450 million in mortgages annually, or about 20% of all home loans. Its "servicing portfolio" of mortgage loans exceeds $1 trillion. Defendant LandSafe, Inc. ("LSI") is an indirectly-owned subsidiary of Countrywide and provided to Countrywide and its customers a variety of real estate closing services including, *inter alia*, appraisal and collateral valuation services, credit reports and title/escrow services. Defendant Angelo R. Mozilo, at all relevant times, was Chairman and Chief Executive Officer of Countrywide and knew of, directed and/or acquiesced in the mortgage-related activities carried out in its and LSI's names as described herein. Defendant Mozilo caused Countrywide to make approximately $4 million in below-market personal mortgage loans to defendant Raines, who was regarded as a "Friend of Angelo."

56.      Upon information and belief, there are presently ongoing criminal and civil investigations of Countrywide and LSI being conducted by, *inter alia*, the Federal Bureau of Investigation and the Securities & Exchange Commission. Such investigations are examining mortgage origination fraud, conflicts of interest, and undisclosed relationships with, *inter alia,* appraisers such as LSI, as well as the practices used to package mortgage-backed securities for sale to investors. Defendants Countrywide and Mozilo have been accused in shareholder litigation of having "misled investors by falsely representing that Countrywide had strict and selective underwriting and loan origination practices, ample liquidity that would not be

31

jeopardized by negative changes in the credit and housing markets, and a conservative approach that set it apart from other mortgage lenders." Defendants Countrywide and Mozilo similarly deceived Fannie Mae and took advantage of its lax and/or non-existent underwriting standards and its lack of effective risk management generally, which defendant Mozilo personally and directly encouraged, all of which has caused massive damages to Fannie Mae as described herein.

57.    Defendant First American Corporation ("First American") is, by its own description, "America's largest provider of business information" operating in five business sectors: title insurance and services, specialty insurance, mortgage information (including real estate appraisal services), property information, and risk mitigation and business services. First American provides real estate appraisal services to savings and loans, banks, and other lenders through its wholly owned subsidiary, defendant First American eAppraiseIt ("eAppraiseIt"). At all relevant times, First American's senior management controlled the "appraisal" and other activities of eAppraiseIt as described below and. As such, Defendant First American bears responsibility therefor. Defendant WaMu has been the largest customer of First American and eAppraiseIt. Additionally, at all relevant times, defendant Anthony R. Merlo, Jr. ("Merlo"), President of eAppraiseIt, knew of, directed and acquiesced in the practices of eAppraiseIt as described herein.

58.    Defendant Goldman Sachs Group, Inc. ("Goldman Sachs") is an integrated financial institution that provided investment banking, underwriting, and advisory services to Fannie Mae and participated directly in certain of the wrongdoing alleged herein.

### F. Non-Party KPMG

59.     KPMG LLP ("KPMG") is an international certified public accounting firm that served as Fannie Mae's purportedly independent auditor from 1969 until December 21, 2004. While KPMG is not a defendant herein, it was heavily involved in and facilitated the actions and inactions of the named defendants and others that are at the core of this litigation.

### GENERAL ALLEGATIONS

### A. THE OPERATIONS OF FANNIE MAE

60.     Fannie Mae is the nation's largest source of financing for home mortgages, typically those costing $417,000 or less (recently and temporarily increased to $729,750 in some markets). As defendant Mudd was quoted in the *San Francisco Chronicle:* "The business that we are actually in is doing affordable, middle-class, plain old 30-year, 15-year fully amortized lending. ...We are very good at it." While chartered by the federal government, and having certain privileges as a result – such as an exemption from state and local income taxes – Fannie Mae is a private, shareholder-owned company and its common stock is publicly traded on the New York Stock Exchange. Its obligations are not backed by the full faith and credit of the United States. Fannie Mae does not loan money directly to consumers. Rather, the Company buys mortgages from banks and other mortgage lenders, thereby freeing up the lenders' limited capital, which in turn allows them to make more loans. The goal of these operations is to encourage home-ownership, especially by low- and middle-income families.

33

61.    The secondary mortgage market involves a range of financial transactions that can occur to a mortgage after a lender has made the loan to a homebuyer. Most commonly, mortgages are "securitized," that is, individual mortgages are sold to another entity that pools them and creates a beneficial interest in that pool of mortgages represented by a new security. The value of that mortgage-backed security ("MBS") rests in large measure on the value of the underlying bundle of mortgages from which it was created. Fannie Mae's "mortgage holdings" consist both of the mortgages it holds directly, and what it holds indirectly through owning MBSs. Its "mortgage credit book of business" consists of these holdings plus its guarantees of mortgages.

62.    Fannie Mae's profit-making operations are based on two components. In its credit guarantee business, the Company gets a fee for guaranteeing the payments on the mortgages it buys, which it then re-sells to investors, usually in the form of mortgage-backed securities.

63.    In its portfolio investment business, Fannie Mae holds the mortgages and mortgage-related securities and other investments that it purchases from banks, other lenders, securities dealers, and other investors. The Company also purchases short-term, non-mortgage assets for liquidity and investment purposes. Fannie Mae funds these portfolio purchases by issuing short and long term debt, and by selling debt securities to domestic and international investors. Fannie Mae profits to the extent that the net yield on the mortgage assets and other investments in its portfolio (*i.e.*, the yield minus any losses in value) exceeds the cost of the debt securities it issued to fund those portfolio investments.

34

64.    Fannie Mae's business is subject to several risks common to financial institutions, some of which have not yet been adequately quantified and/or otherwise reflected on its financial statements, particularly those which reflect "investments" in questionable securitized derivative products and the purchase of non-recourse mortgage portfolios. Most mortgage borrowers in the United States can prepay their mortgages at any time without any penalty. Thus, when interest rates decline, borrowers refinance their mortgages at lower rates, causing their original mortgages to have a shorter life than the lender projected. Consequently, when interest rates drop, the investment yield on Fannie Mae's mortgage-related investments is reduced. When this occurs, Fannie Mae receives cash as the older, higher-rate mortgages are paid off, but faces the risk that it will not be able to reinvest this cash at rates that are above the rates it is required to pay on its outstanding debt securities. This risk is called "prepayment risk."

65.    Fannie Mae also faces significant risk – called the "credit risk" -- of non-payment of its mortgage credit book, particularly if there is inadequate borrowers' ability to pay, inadequate anticipation of eventual payment burdens, over-valued appraisals of the underlying real estate and lax loan underwriting, and inadequate borrowers' equity, all of which circumstances have been prevalent in the post-2004 period. These risks are compounded by the lack of legal and/or practical recourse that Fannie Mae has against the originators of such excessive risk mortgages or pools or related derivatives when defaults arise, all of which is compounded when the Company's financial statements do not accurately reflect, in the form of adequate provisions for loan losses, the collectability of its loan portfolios or other deterioration in the value of mortgage-related assets.

35

66.     Another risk is linked to the short-term and long-term debt Fannie Mae issues to fund its mortgage purchases. When interest rates decline, Fannie Mae's cost of issuing new short-term debt also declines, but it is required to pay the original and higher interest rates on its longer-term debt until that previously issued debt matures or can be called. This risk is called "interest rate risk."

67.     The interest rate risk and prepayment risks expose Fannie Mae to radical earnings volatility from quarter to quarter. To offset or hedge against these risks, Fannie Mae typically engages in a variety of derivative transactions and related hedges. As the name implies, a derivative is an asset the value of which derives from the value of some other asset. In effect, a derivative transaction is a side bet on interest rates, exchange rates, commodity prices, and so on. Derivative transactions used by Fannie Mae include issuing callable debt, interest rate swaps, options to enter into interest rate swaps ("swaptions"), interest rate caps and floors, foreign currency swaps, and forward starting swaps. Other than those derivative transactions used by the Company's management to manipulate its reported earnings, many of these transactions reflect Fannie Mae's legitimate hedging activities while others were used to boost financial returns without due regard for the underlying risks faced by the holders of such "investment" vehicles. The SEC's Chief Accountant has called Fannie Mae "one of the largest users of derivatives in the world."

### B. PRE-2005 CLAIMS

68.     Under the executive compensation program at Fannie Mae, senior management reaped financial rewards when the Company met EPS growth targets established, measured, and set by senior management itself. Beyond the basic package of

salary and benefits, three significant components of compensation depended directly on

reaching EPS targets: 1) the Annual Incentive Plan ("AIP"), under which by 2003 more

than 700 employees were eligible for bonuses; 2) the Performance Share Plan, which

granted stock to the 40-50 senior executives based on 3-year performance cycles; and 3)

the EPS Challenge Grant, a company-wide program championed by defendant Raines that

tied the award of a substantial amount of stock options to the doubling of core business

EPS from 1998 to 2003.

69.     The AIP bonus pool grew from $8.5 million in 1993 to $65.1 million in

2003.  Bonuses for executives often totaled more than their annual salary.  For senior

executives, such as defendants Raines, Howard and Spencer, EPS-driven compensation

dwarfed basic salary and benefits.

70.     This compensation structure at Fannie Mae greatly increased the incentive

for senior executives to manipulate both the Company's EPS and its EPS targets.  Indeed,

Fannie Mae senior management achieved the Company's earnings targets pre-2005 by

regularly manipulating accounts and accounting rules, calibrating repurchases of shares

and debt to achieve EPS targets, entering into questionable transactions, and misallocating

resources.  Management routinely shifted earnings to future years when the EPS target for

the maximum bonus payout for the current year appeared likely.  Subsequent to 2004,

although the earlier manipulations appear to have ceased, Fannie Mae's assets, earnings

and net worth were nevertheless overstated by material amounts due to, *inter alia*,

management's failure to make adequate provision for loan losses and from the excessive

and imprudent risks they intentionally caused the Company to accept.

71.     Fannie Mae's Board and its audit and compliance committees utterly failed to meet their obligations to ensure the safety and soundness of the Company's management and operation or to be justifiably satisfied that its financial statements were prepared in accordance with GAAP and that they were audited in compliance with Generally Accepted Auditing Standards ("GAAS"). The Board failed to stay appropriately informed of corporate strategy, to assure appropriate delegations of authority, to ensure that Board committees functioned effectively, to provide an appropriate check on defendant Raines and other top officers of the Company, and to exercise independence and vigilance in supervising management on behalf of the Company and its shareholders. Even with replacements of Fannie Mae's senior management in late 2004 and new directors being added to the Board thereafter, the Board failed again in its oversight of such management, its imprudent acceptance of risks and the generation of financial statements prepared in accordance with GAAP that were audited consistent with GAAS.

72.     As a result of these actions, the members of the Board either breached or aided and abetted the breach of the fiduciary obligations owed by them and Fannie Mae's senior officers and directors to the Company and its shareholders and, as well, caused its assets to be wasted.

### 1. IMPROPER DEFERRAL OF INCOME AND EXPENSES TO SUBSEQUENT PERIODS

73.     As noted above, the volatility of interest rates has an immediate, and often significant, effect on Fannie Mae's income. The governing principles of GAAP reflect this economic reality. Under Financial Accounting Standards Board Statement of Financial

Accounting Standard ("FAS") 91, Fannie Mae must recognize adjustments to its income by estimating the effective yield of its mortgages and mortgage securities every time it reports results to investors. In doing so, Fannie Mae must consider how fast homeowners might prepay their mortgages, adjust the effective yields on its securities, and make a new estimate about future repayments. This revision in expected yields must be booked immediately as an adjustment to interest income.

74.     Prior to 2005, the senior management of Fannie Mae regularly violated FAS 91 to hit EPS targets. For example, in 1998, internal projections of financial results showed that the Company would have unanticipated amortization costs of $440 million, a number which should have adjusted Fannie Mae's income downwards under FAS 91. However, complying with FAS 91 would have caused the Company's EPS to fall below the minimum bonus target range, resulting in no bonuses for Fannie Mae's senior executives.

75.     Rather than complying with GAAP by reducing the Company's income by $440 million, management adjusted it by only $240 million, "deferring" the remaining $200 million in expenses to subsequent years. This amount became known as the "catch-up."

76.     Moreover, the reserve established by this deferral, commonly called a "cookie jar" reserve, itself violated GAAP (FAS 5), which prohibits the establishment of a reserve for general or unspecified business risks.

77.     KPMG, the Company's supposedly-independent auditor, initially disagreed with the Company's refusal to fully book the $440 million shortfall, but

39

ultimately, due to its lack of independence and relationships with defendants Raines, Howard and Spencer, and the fact that Fannie Mae was one of its most significant clients, acquiesced to the individual officer defendants' manipulation and termed this deferral an "audit difference." All the while, the members of Fannie Mae's Board, and the members of its Audit Committee in particular, failed to adequately oversee KPMG's purported audits of the Company's financial statements and did not properly satisfy themselves that such audits were carried out in conformity with GAAS.

### 2. IMPROPER USE OF HEDGE ACCOUNTING ON DERIVATIVE CONTRACTS

78.     During the period at issue, as indicated above, Fannie Mae was one of the world's largest users of derivatives, which are intended to act as a hedge against the volatility of the financial markets. Under GAAP (FAS 133), all derivatives are to be recorded as either assets or liabilities on a company's balance sheets at their fair value, unless they qualify for "hedge accounting." Hedge accounting provides a means for matching the earnings effect of a derivative and the related designated hedge transaction, thereby mitigating the volatility of earnings on a company's books when a company is successfully hedging. However, under GAAP, if a company's hedges are ineffective in offsetting the specific risk being hedged, that result, whether negative or positive, must be recorded. If there is a low correlation between the changes in value of a derivative and the changes in value of the hedged item, an increased volatility in earnings will be – or should be – apparent on a company's books.

40

79.    For a company with a huge and dynamic hedging program such as Fannie Mae, hedge accounting poses major operational challenges to ensure the continuing effectiveness of its hedging instruments.  As OFHEO concluded with respect to the pre-2005 period, "By inappropriately assuming that the vast majority of its derivatives were 'perfectly effective' hedges, the hedging system adopted by Fannie Mae management achieved the volatility-dampening benefits of hedge accounting without the need to address the associated operational challenges."  As a result, "Fannie Mae's improper implementation of FAS 133 masked billions of dollars of earnings volatility," all of which was known or should have been known by the defendants, their colleagues and KPMG. Even following the foregoing OFHEO report, Fannie Mae's senior management once again concealed the material degree to which the Company's derivatives had declined in value and were not marked to market on its balance sheets, all of which was in violation of FAS 133.

80.    In its SEC filing at the close of 2005, Fannie Mae identified its improper application of hedge accounting as one of the two most significant reasons for its need to lower its reported earnings through 2004 by $10.6 billion. As to subsequent periods, its management has yet to own up to the on-going misapplication of hedge accounting.

### 3. Miscellaneous Manipulations

81.    Prior to 2005, Fannie Mae's senior management employed a variety of clever and corrupt schemes to manipulate the appearance of the Company's financial performance so as to secure the extraordinary bonuses to which they were in fact not

entitled in which Fannie Mae's Board acquiesced. As OFHEO has now reported, the Company's management:

- deliberately developed and adopted accounting policies to spread estimated income or expense that exceeded predetermined thresholds over multiple periods;

- established a materiality threshold for estimated income and expense, within which management could avoid making adjustments that would otherwise be required under GAAP;

- made discretionary adjustments to the financial statement for the sole purpose of minimizing volatility and achieving desired financial results;

- forecasted and managed future unrecognized income associated with misapplied GAAP;

- capitalized reconciliation differences as 'phantom' assets or liabilities and amortized them at the same speeds as 30-year fixed-rate mortgages;

- developed estimation methods that were inconsistently applied to retrospective and prospective amortization required by GAAP for current

42

and future periods;

• developed and implemented processes to generate multiple estimates of amortization and varying assumptions in order to select estimates that provided optimal accounting results;

• failed to properly investigate the concerns of an employee regarding illogical and anomalous amortization results, along with a further allegation by that employee of an intent to misstate reported income; and

• tolerated significant weaknesses in internal controls surrounding the amortization process.

### 4. OTHER MISCONDUCT

82.     It was only in late 2003, when the Federal Home Loan Mortgage Corporation ("Freddie Mac") was forced to restate its earnings following the replacement of its independent auditors, that regulators woke up to the wrongdoing at Fannie Mae. OFHEO, and subsequently the SEC, conducted investigations that confirmed the wrongful conduct set out above.

83.     On December 21, 2004, in the face of severe criticism from OFHEO (which had, itself, been grossly negligent in its oversight of Fannie Mae and Freddie Mac) and the SEC, the Company's directors compounded the breach of their duties to Fannie Mae by refusing to fire defendants Raines and Howard for cause and demanding

disgorgement of their ill-gotten millions.  Instead, the Board accepted the resignations of these defendants with the knowledge that, by so doing, they would cause the further waste of Fannie Mae's corporate assets.

84.    As a result, defendants Raines and Howard became arguably entitled to collect tens of millions of dollars in severance benefits under the new no-fault termination provisions in their employment contracts (added in 2004 after OFHEO had finally begun to investigate) and to keep millions of dollars in previously received bonuses and stock sales that the Company was entitled to rescind under Sarbanes-Oxley and should have rescinded given what they knew or should have known about Fannie's material overstatement of its earnings, assets and net worth.

### 5. WRONGFUL CONDUCT OF GOLDMAN SACHS

85.    Defendant Goldman Sachs, together with Fannie Mae officers, intentionally designed and implemented sham transactions with no legitimate business purpose in order to create paper losses for Fannie Mae and create the false appearance that Fannie Mae's earnings were stable and not volatile. According to an article in THE NEW YORK TIMES, "Goldman Sachs was injecting dangerous financial products into the world's bloodstream for years." These "products" were integral to Goldman Sachs' dealings with the Company as described below.

86.    Specifically, in the fourth quarter of 2001, and the first quarter of 2002, Goldman Sachs, for its unjust economic benefit, devised and executed a series of Fannie Mae $20 billion and $10 billion Real Estate Mortgage Investment Conduit ("REMIC") transactions (Fannie Mae REMIC Trusts 2001-81 and 2002-21).  Goldman Sachs was the

underwriter/dealer for both REMIC Trusts. These REMIC transactions had no legitimate economic or business purpose. Their sole purpose was to shift artificially $10 million of Fannie Mae's earnings into future years, in which years the Company's reported earnings were artificially overstated.

87.    Entering into transactions that have no economic purpose other than shifting income is a violation of GAAP. In addition, the transactions were not accounted for properly, in part because of internal control deficiencies at Fannie Mae, including the Company's lack of systems to account for the transactions properly, facts known or which should have been known to the Board. KPMG knew or should have known of the existence of such sham transactions and the fact that they were not accounted for by Fannie Mae in accordance with GAAP; it did nothing to ameliorate such false accounting, all of which was known or should have been known by the Company's senior management and members of its Board of Directors.

88.    Neither Fannie Mae's management nor Goldman Sachs made truthful, complete, or appropriate disclosures in the associated prospectus supplements for the foregoing REMIC Trusts, Fannie Mae financial statements, or other public statements about the transactions. To the contrary, Fannie Mae's management and Goldman Sachs conspired to create a joint strategy of false and deceptive public statements, actively trying to conceal the purpose and true nature of these transactions, all of which was facilitated by KPMG. Upon information and belief, Goldman Sachs, acting as broker, dealer and/or other intermediary sold to Fannie Mae high-risk derivative and other "dangerous financial

products" causing it substantial damages in an amount which cannot presently be determined.

## C. SUBPRIME CLAIMS

89.     Fannie Mae's mandate is to provide stability and liquidity in the residential mortgage market by, *inter alia,* its activities in the secondary mortgage market.  However, due to serial mismanagement, it has done so by accepting negligently ever-increasing risks in order to provide the funds needed to finance such mortgage loans and in making them. In fact, Fannie Mae has been caused by its senior management and Board to go very far afield from this mission and has become the equivalent of a gambling casino.

90.     On an accelerating basis from 2005 on, Fannie Mae took on an enormous and highly risky exposure to what may be summed up (and detailed below) as the pertinent aspects of the emerging "subprime crisis" of 2007-2008.  Fannie Mae's contemporary losses, and its increasingly risky position going forward, did not merely result from market economic conditions interacting with its established pre-2004 operations.  Rather, most of Fannie Mae's current losses and risks resulted from post-2004 actions and policies of its senior management and Board which were unprecedented, inadequately disclosed, and contrary to defendants' fiduciary duties. To summarize, Fannie Mae:

a.  took on unprecedented high-risk subprime mortgage holdings through its purchase of "private label" mortgage backed securities ("MBS"), that is, those not issued by Fannie Mae or Freddie Mac, which were disproportionately high relative to its (highly leveraged and overstated) net worth;

46

b.  took on unprecedented higher-risk nontraditional mortgage holdings (including both low-documentation and other "Alt-A" mortgages; and, ARMS with exotic payment, amortizing, and reset terms) throughout its mortgage credit book of business;

c.  treated at face value the illusory "AAA" ratings of MBS based on senior tranches of subprime or risky nontraditional mortgages, when those ratings patently depended on models not realistically taking economic downturn periods into account;

d.  let its mortgage credit book of business come to have substantial amounts of mortgages that were risky for lack of much borrower equity when taking into account not only the loan-to-value ("LTV") ratio of the primary mortgage but also "piggyback" mortgages as well, despite common knowledge of the tendency to high default rates for these;

e.  overlooked appraisals which management knew or should have known were inflated artificially and other mortgage origination abuses, as detailed further below;

f.  exacerbated these heightened risks in its mortgage credit book by taking on ill-timed extreme over-leveraging of its actual hard-asset net worth by pretending that certain largely illusory "soft" assets deserved to be counted the same as "hard" assets;

47

g.  accelerated these actions and policies increasing its exposure to market and economic downturns in disregard of stark signals in 2006-2007 from the market against doing so.

### 1. SUBPRIME, "NONTRADITIONAL," AND OTHER HIGH-RISK MORTGAGES, AND SOFT ASSETS

91.    From approximately 1998 through 2004, the Company and its shareholders were the victims of breaches of fiduciary duty and other illegal accounting manipulations by the Company's senior management and Board. This wrongdoing resulted in an estimated $10.6 billion of losses to the Company, well over $1 billion in expenditures by the Company to recreate and correct historical financial documents, massive expenses for legal and expert fees, and substantial losses of goodwill. During the past several years since that debacle, Fannie Mae's senior management and Board made a desperate attempt to recoup earnings which "disappeared" through restatement and otherwise. They also made a quixotic effort to restore the Company's market share that was being ceded (prior to 2006) to "private label" mortgage-backed securities – quixotic because they obtained a large market share at a time, and of a nature, when prudent lenders rightly preferred to stay out of the portions of the market Fannie Mae was increasingly taking. In these attempts and efforts, the senior management and Board deviated from the Company's traditional guidelines for the purchase of mortgage loans and pools to purchase, or guarantee, numerous subprime and "non-traditional" mortgage holdings despite their materially higher risk profile. Moreover, the defendants concealed the extent to which they committed the Company to this ruinous course, and ignored warning signals from

the market that should have spurred the defendants to change course and take actions that would have mitigated the economic catastrophe now being visited on the Company.

92.    "Subprime" mortgages are different from "prime" mortgages in the "borrower quality characteristics" that do not pass muster under the normal standards for evaluating whether the borrower has the economic capability to pay back the loan, typically because of past credit deficiencies. Put another way, the borrower is not considered "credit-worthy" under normal lending standards; the risk of a subprime borrower defaulting on the loan because he cannot meet his loan payments is far higher than the similar risk with a prime borrower. Prior to 2005, Fannie Mae had not accumulated significant private label MBS's backed by subprime mortgages. Changing this was one of Fannie Mae's key risk-increasing actions during this time. In June 2007, Fannie Mae reported that $47.2 billion of its $122.8 billion of private label mortgage-backed securities were backed by subprime loans. In early 2008, BARRON's cited Fannie Mae as having a $133 billion subprime book. These are enormous figures when properly compared, not with Fannie Mae's entire book, which gives a false sense of cushioning, but with Fannie Mae's small net worth. Fannie Mae's operations expose it to the kind of high default rates on subprime holdings that under realistically foreseeable circumstances, credit losses on these subprime loans could wipe out a substantial part, or even the whole, of the "hard asset" portion of Fannie Mae's net worth. Homes may have low borrower equity either (1) because high "loan to value" ("LTV") prime mortgages have a higher loan-to-value ratio than non-high LTV mortgages, with the borrower commonly borrowing 90 percent or higher of the value of his home – a problem which may be largely solved by mortgage insurance; or (2) because the borrower has a "piggyback" mortgage, such

49

as a fixed second lien, at time of purchase (or, a home equity line of credit)    Traditionally, Fannie Mae obliged borrowers with low borrower equity to take out mortgage insurance, which provided security and recruited the mortgage insurer as an incentivized, reliable overseer of the creditworthiness of the loan. Then, in 2005-2006, Fannie Mae went along with an increasing offering of loan arrangements with a LTV prime mortgage of, say, 80 percent, that became part of Fannie Mae's mortgage credit book, coupled with a "piggyback" second lien that provided most or all of the other 20 percent, in order to avoid the mortgage insurance requirement. The mortgage insurance industry, and researchers, fruitlessly pointed out to Fannie Mae the dangers of this maneuver. It was one of Fannie Mae's most significant risk-increasing actions to disregard the pleas of the mortgage insurance industry and greatly to reduce its vital role during these critical years.

93.    Low borrower equity means that declining home prices can readily drive the value of the property below the amount borrowed, a so-called "underwater" situation, giving the borrower the economic incentive to simply give up trying to pay back the loan. The prime lender is then left either to try to work out the situation with a sale complicated by the need to deal with the secondary lender, or formally foreclose to eliminate the secondary lender's rights, either way not recovering the balance due on its mortgage. Such risk is further enhanced if, through lax underwriting standards or otherwise, the underlying homes have been "appraised" at excessive levels to obtain financing which would not support the mortgage loans applicable thereto.

94.    Evaluating the extent of these risks when making a subprime or low borrower equity loan is a challenge, if not an outright gamble, with the best of information, but the

difficulty of that task – or the size of that gamble – has been further magnified by the introduction of a particular kind of nontraditional loan, the "low documentation" loan. As its name suggests, the "low doc" loan has the apparent attraction of requiring less paperwork in the process of making a mortgage. Yet cutting the paperwork means that the lender has far less information about the credit-worthiness of the borrower than the normal underwriting process would produce – often not even having rudimentary confirmation of the borrower's claims concerning his income and other assets. The combination of Fannie Mae's lax or non-existent loan underwriting standards (best exemplified by its "Desktop Underwriting" automated loan service which generated approvals used purportedly to "assess" loans for purchase by Fannie Mae), subprime mortgages and inflated appraisals for unqualified borrowers generated a toxic mixture for the Company, facts known or which should have been known to each member of the Company's Board and senior management. Such lax and/or non-existent loan underwriting standards and the Company's ineffective risk management made it easy for predatory lenders such as WaMu, Countrywide, and the other subprime facilitators to take advantage of Fannie Mae, which they did, participating in the packaging and funneling into the Company of billions of dollars of subprime and other high-risk mortgages with little or no borrower equity when taking into account the real, rather than inflated, value of the property. It was one of Fannie Mae's key actions and policies not merely to offer little resistance, but to actively encourage high-risk nontraditional mortgages in its mortgage credit book.

95.     For a number of years, bankers and economists alike have been expressing concern over the rising delinquency rates in subprime and nontraditional mortgages, especially

because the risk of delinquency would be heightened by a downturn in the housing market. Fannie Mae's Board and senior management knew or should have known that the probability of default is many times higher for a subprime or low borrower equity loan, and higher for a loan with nontraditional terms, than for a prime loan with substantial borrower equity and traditional terms.

96.     As long ago as the third quarter of 2002, the Mortgage Bankers Association of America reported that the rate at which foreclosures were begun for subprime loans was more than 10 times that for prime loans. As a senior economist at the Federal Reserve Bank of St. Louis and a financial economist at the Office of the Controller of the Currency put it in a 2006 article, "the propensity of borrowers of subprime loans to fail as homeowners (default on the mortgage) is much higher than for borrowers of prime loans."

97.     A 2004 study by Charles A. Calhoun, "The Hidden Risks of Piggyback Lending," for SMR Research Corporation, showed that piggyback loans were increasing, particularly in metropolitan statistical areas at greatest risk of price depreciation, rendering such loans increasingly risky.

98.     In an August 24, 2005, article, *USA Today* reported that economists and bankers were "getting nervous about the wide use of higher-risk financing, such as ... subprime mortgages for low-income home buyers." As chief economist Doug Duncan of the Mortgage Bankers Association stated in the article, easy financing helps people buy homes, but also raises foreclosure risks.

99.     Similarly, at the Prepayment and Mortgage Credit Modeling & Strategy Conference put on by CPR and CDR Technologies Inc. in October 2005, Freddie Mac Chief

Economist Frank Nothaft stated that subprime delinquency rates remained worrisome, with subprime delinquencies as much as eight to nine times higher than prime loans.

100.    In a February 2, 2006 speech at the Financial Services Institute, Susan Schmidt Bies, a member of the Federal Reserve Board, noted that the Federal Reserve and other banking supervisors were concerned that then-current risk-management techniques did not fully address the level of risk in subprime and nontraditional mortgages – a risk that would be heightened by a downturn in the housing market. Governor Bies also observed that lenders were increasingly combining nontraditional mortgage loans with weaker mitigating controls on credit exposures.

101.    Yet at the very same time such key participants in the financial marketplace were expressing their serious concerns regarding the dangers of nontraditional lending, Fannie Mae was not just forging ahead to shoulder ever increasing risks from lower borrower quality, lower borrower equity, and low documentation loans, many of which were supported by inflated appraisals. Rather, the Company was compounding these gambles by the ill-advised nontraditional terms of the loans it was taking into its mortgage credit book.

102.    By way of comparison, in 2001, Fannie Mae had bought virtually no mortgages or mortgage-based securities that included adjustable-rate mortgages (ARMs). Yet by 2005, such items accounted for 22% of Fannie Mae's volume, with a similar excessive level during early 2007. A substantial fraction of Fannie Mae's volume of mortgages and mortgage-based securities included particularly exotic, risky, and poorly managed types of terms, such as payment-option ARMs, interest-only loans, and negative amortization loans. One of the ARM variants Fannie Mae took on in substantial quantities were "2/28 hybrid

ARMs," which reset from an initial low or "teaser" rate after two years into a much higher long-term rate. A 2/28 ARM was likely to leave the borrower no feasible alternative at the two-year end of the "teaser" other than sale or refinancing if these were possible, and, if market and personal conditions prevented these, lead to default and foreclosure in ways ruinous to Fannie Mae. Outside observers warned about the dangers of these products, and the enormity of the ill-advised risk Fannie Mae undertook by welcoming lenders who did not qualify borrowers at the fully indexed rate. It was one of Fannie Mae management's key risk-increasing policies to welcome these loan terms.

103.    At the speculative peak of the bubble in housing prices, mortgages, and mortgage-backed securities in 2006 and 2007, Fannie Mae's Board and senior management disregarded many stark signals from the market against the Company's course of action. The ABX is the index which tracks the value of securities backed by subprime home loans, which other lenders look to as a guidepost in determining values for their holdings. As 2007 went on, the ABX declined precipitously, with some portions of it down as much as 79% during the year. The attention that other lenders gave to the ABX was not matched at Fannie Mae. Notwithstanding these warnings, Fannie Mae continued to acquire subprime mortgage-based securities, and described them as having a market value above 90 cents on the dollar, in radical disagreement with the signals from the ABX.

104.    Fannie Mae's management claimed its policies regarding subprime loans and related securities were necessary to finance affordable housing, as it must pursuant to 12 U.S.C. 4562-63.    However, observers such as the National Association of Affordable Housing Lenders demonstrated that Fannie Mae could have found better ways to accomplish

such objective and better protect the Company's assets from loss. For example, the Senate Banking Committee held a hearing in February 2007 at which leading witnesses, including officials from the NAACP and AARP, testified about how the increase of nontraditional mortgages, such as the 2/28 ARMs – including Fannie Mae's increases of these in its mortgage credit book – would be disastrous for the future of affordable housing. The witnesses laid out the significance of a contemporary study by the Center for Responsible Lending – affiliated with Self Help CU, the leading community development credit union in the country – calculating that almost one in five subprime mortgages recently sold, an estimated 2.2 million homes, would end in foreclosure. The Center's study cited 2/28 ARMs and similar nontraditional mortgages, accepted by Fannie Mae, as the principal reasons for this dire prospect. Similar warnings in prior years were cited earlier. It was the choice by the senior management and Board of Fannie Mae of actions and policies, not merely the goal of affordable housing, that led to the high-risk lending practices.

105.    Another way of describing the significance of the policies and actions of Fannie Mae's Board and senior management during recent years consists of placing these in the context of what the Federal Reserve Board was doing during the same time. The short-term interest rate set by the Federal Reserve Board (to be precise, the rate set by the Federal Open Market Committee as the objective for the federal funds rate), which had been as low as 1% in 2003 and was still 2.25% at the end of 2004, went to 4.25% at the end of 2005 and 5.25% in June 2006. Economic observers in 2005-2006 knew that the Federal Reserve saw inflationary bubbles in regional housing markets, and was using its tools to combat these. Precisely at this time, for its own ill-chosen reasons, Fannie Mae leaped into relaxing its

lending standards, in the ways that have been described, in what amounted to an effort to "fight the Fed" by underwriting feverish housing credit excesses precisely when the Federal Reserve set about curbing those excesses. During 2006, the market priced in the inevitability that those bubbles would not prove sustainable. Fannie Mae plunged on nevertheless.

106.     In the course of 2006 and 2007, other lenders responded to market signals by pulling back on ownership of mortgage-backed securities that included subprime loans. Fannie Mae not only did not match this pullback, its management continued to expand further into this high-risk sector. As Fannie Mae disregarded the market signals heeded by others, its share of the market for such securities expanded greatly, with the combined share of Fannie Mae and Freddie Mac rising from 38% in 2006 to 75% in fourth quarter 2007.

107.     In June 2007, Fannie Mae reported that it held $122.8 billion of private mortgage-backed securities. Fannie Mae sought to treat these MBS as solid assets, even though $47.2 billion were recognized as subprime, by maintaining that full credence is deserved by the "AAA" ratings initially given to subprime holdings that were structured as relatively more secure portions ("senior tranches") of securitized pools. However, the senior management and Board knew, or should have known, that the ratings were illusory, because the "AAA" ratings were based on models that did not adequately include periods of economic downturns and were otherwise illegitimate. Notwithstanding its stated justifications, senior management, including defendant Mudd, increased Fannie Mae's market share because, in the short term, this generated extra reportable but illusory profits. But, just as the market was signaling, this proved highly ill-advised as 2007 went on.

56

108.   These severe risks in connection with Fannie Mae's subprime and other high-risk lending activities were known or should have been known by its Board and senior management at all relevant times. These risks were vastly magnified by the absence of controls at all levels of the Company as well as the Board's failure to comply with OFHEO's directions as to proper risk management. The risks first began to be manifested publicly in late 2007, when a declining housing market and an increasing mortgage delinquency rate caused a crisis in the mortgage market. Then, the value of mortgage-related securities declined substantially, particularly those securities directly or indirectly tied to subprime lending.

109.   Subprime lending, and other types of high-risk lending, were not the only excessively risky mortgage activity into which the Board and senior management led Fannie Mae. The subprime defendants greatly expanded Fannie Mae's business in "Alternative-A," or "Alt-A" mortgages. Alt-A loans are made to borrowers without the record of deficiencies of subprime borrowers, but require fewer, or often no, documentation supporting the borrower's claimed income and other aspects of his supposed credit-worthiness. The reasons why such loans have been popular with borrowers is obvious – they can inflate their claimed earnings with near impunity. In fact, Fannie Mae allowed "stated income" mortgages not merely for self-employed borrowers, who at least had sometimes an understandable reason to seek relief from documenting their income, but even for employed borrowers with ready W-2 documentation at hand. For these borrowers, Fannie Mae had virtually no reason to accept "stated incomes" other than

to beg them to inflate their claimed earnings so the flood of unsound loans could surge ever higher.

110.    Not surprisingly, the equally obvious dangers posed by such mortgages to any prudent lending process have materialized as Alt-A mortgage-lending has exploded in recent years. So many Alt-A borrowers are now in fact not creditworthy that one industry expert, Mark Adelson, head of structured finances at Nomura Securities International, has observed, "The Alt-A market has absorbed and disguised a portion of the subprime space. You can debate how to define these loans, but many have ended up being an Alt-A product with subprime deficiencies." Indeed, in March 2008 BARRON'S conservatively estimated that Fannie Mae is facing a default rate of 12.5 percent on its $314 billion portfolio of Alt-A mortgages. Again, these are enormous figures when properly compared, not with Fannie Mae's entire mortgage credit book, which gives a false sense of cushioning, but with Fannie Mae's relatively small reported net worth. The subprime defendants' actions and policies exposed Fannie Mae to the kind of high default rates on nontraditional holdings that under realistically foreseeable circumstances Fannie Mae's credit losses on these loans could wipe out a substantial part, or even the whole, of the "hard asset" portion of the Company's net worth.

111.    In January 2007, OFHEO directed Fannie Mae to take action to comply with the Federal Financial Regulatory Agencies' October 2006 report titled "Interagency Guidance on Nontraditional Mortgage Product Risks," which seeks "to ensure that loan terms and underwriting standards for nontraditional mortgage loans are consistent with prudent lending practices, including credible consideration of a borrower's repayment capacity." Fannie Mae

58

did not comply with OFHEO's directive until July 2007, and then only incompletely. During this time, the percentage of the company's single-family mortgage credit book of business made up by Alt-A mortgages or structured Fannie Mae MBSs backed by Alt-A mortgages increased from approximately 11% to 12%, an increase of about $24 billion to a rough total of $310 billion by mid-2007. The build-up, and the delay in tightening underwriting standards, was one of Fannie Mae's key risk-increasing actions recklessly pursued by defendant Mudd and his colleagues.

112.    In sum, the transformation of Fannie Mae into a high-risk operation did not occur either merely by the operation of the market or the economy, or otherwise beyond the purview of its Board and senior management. Rather, the Board and senior management undertook a series of actions and policies in 2005-2006, accelerating in 2007, which pyramided the Company to an unacceptable level of risk.

113.    The stewardship of Fannie Mae's Board and senior management with respect to the Company's assets has been no more prudent. Almost half of Fannie Mae's capital consists of largely illusory "soft" assets such as "deferred tax assets" and "Lower Income Housing Tax Credit partnerships." Fannie Mae has thus built this fragile pyramid of high-risk loans atop so highly leveraged a base of hard assets that the Company's net worth was called "wafer thin" by OFHEO – the worst possible shape for Fannie Mae to be in as the predictable period of deleveraging succeeded the prior era of loose-credit bubbles.

114.    As BARRON'S has reported, Fannie Mae's $45.4 billion net worth includes $13 billion of deferred tax assets that have value only in the highly unlikely event of the Company earning enough money in the near future – approximately $36 billion – to employ them.

115.    The truly limited utility of this asset – assuming it has any – may compel the Company to write down its value, thereby sharply reducing Fannie Mae's net worth. Indeed, if Fannie Mae was a bank, this entire asset would be wiped out, as bank regulators limit the amount of deferred tax assets for regulatory purposes to the lesser of the amount expected to be used within one year or 10 percent of the institution's regulatory capital. Nevertheless, the Company's Board and senior management unjustifiably insist that the value of this intangible asset will somehow be realized over time.

116.    Another soft asset is Fannie Mae's $8.1 billion of Lower Income Housing Tax Credit partnerships, the only value of which are the tax credits they generate from their intended operating losses. Here again, Fannie Mae has not made, and is not likely to make, enough money to employ these tax credits. This asset is, accordingly, apt to dwindle away without providing the Company any benefit, and even the Board and senior management has refused to make any claims concerning the future value of this asset. Prudent management would have kept the actual limited "hard" net worth in mind when deciding on the actions and policies of high-risk lending. The Board and senior management refused to do so, thereby pyramiding the Company's leveraged operation.

### 2. THE COVERUP OF FANNIE MAE'S RISK EXPOSURE

117.    Fannie Mae's senior management and Board, by their fiduciary duties of care, good faith and loyalty, owe to Fannie Mae a duty to ensure that the Company's financial reporting fairly represents the operations and financial condition of the Company. In order to adequately carry out these duties, it is necessary for the Board, its Audit Committee, and

senior management to know and understand the material, non-public information that should be either disclosed or omitted from the Company's public statements.

118.    This material, non-public information principally included Fannie Mae's exposure to the subprime lending market crisis. Furthermore, defendants Ashley, Beresford, Horn, Smith and Wulff, as members of the Audit Committee, had a special duty to know and understand this material information as set out in the Audit Committee's charter, which provides that the Audit Committee is responsible for reviewing financial information and earnings guidance provided to analysts and rating agencies.

119.    Defendants Mudd, Levin, Williams, Lund, Niculescu, Senhauser, Bacon, Knight, Blakely, Hisey and Swad had ample opportunity to discuss Fannie Mae's exposure to the subprime lending market crisis with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, defendants Mudd, Ashley, Pickett, Swygert, Rahl, Wulff, Smith, Macaskill, Beresford, Gaines, Horn, Freeh, Sites, Gerrity and Duberstein as directors of Fannie Mae, had ample opportunity to discuss this exposure with management and fellow directors at any of the Board meetings that occurred from early 2006 to the present, as well as at meetings of committees of the Board.

120.    Yet, despite these duties, through most of the period from May 2006 through August 2007, the Board and senior management negligently, recklessly and/or intentionally, by their actions or inaction, did not allow Fannie Mae to issue any earnings press releases or filings concerning the Company's financial results that candidly and accurately described the Company's exposure to the subprime crisis. Instead, the Board and senior management caused

or allowed Fannie Mae to issue monthly reports that simply described Fannie Mae's gross mortgage portfolio balances.

121.    On July 27, 2007, the Board and senior management caused or allowed Fannie Mae to issue one of those monthly reports for June 2007. This report disclosed that Fannie Mae's portfolio included $47.2 billion of securities backed by subprime loans. To mask the dangers of such a portfolio, however, the report emphasized that $46.9 billion of those securities were rated AAA and had not been downgraded.

122.    On August 16, 2007, approximately one week *after* the credit markets seized up as a result of the subprime crisis, the Board and senior management caused or allowed Fannie Mae to issue its fiscal 2006 annual report on Form 10-K. The filing reported $4.059 billion in net income for the year. The filing also disclosed, in a general fashion, Fannie Mae's exposure to subprime loans. The filing, however, omitted specific details concerning how the exposure would affect Fannie Mae's future earnings and suggested that Fannie Mae's vastly increased portfolio of high risk mortgages was simply a function of "the market," and did not reflect action or inaction by senior management and the Board. In particular, the filing provided as follows:

> We are exposed to credit risk on our mortgage credit book of business because either we hold the mortgage assets in our portfolio, which consists of mortgage loans, Fannie Mae MBS and non-Fannie Mae mortgage-related securities, or we have issued a guaranty in connection with the creation of Fannie Mae MBS backed by mortgage assets. Borrowers of mortgage loans that we own or that back our Fannie Mae MBS or non-Fannie Mae mortgage-related securities may fail to make the required payments of principal and interest on those loans, exposing us to the risk of credit losses. Factors that affect the level of our risk of credit losses include the financial strength and credit profile of the borrower, the structure of

the loan, the type and characteristics of the property securing the loan, and local, regional and national economic conditions.

For example, loans that have unpaid principal balances that are high in relation to the value of the property, which are commonly referred to as loans with high loan-to-value ("LTV") ratios, generally tend to have a higher risk of default and, if a default occurs, a greater risk that the amount of the gross loss will be high compared to loans with lower LTV ratios. The LTV ratio of an outstanding mortgage loan changes as the unpaid principal balance of the loan and the value of the property securing the loan change. Depending on the structure of the loan, the unpaid principal balance of the loan may increase or decrease over time. Similarly, depending on local, regional and national economic conditions, or the underlying supply and demand for housing, the value of the property securing the loan may increase or decrease over time. As of December 31, 2006, approximately 10% of our conventional single-family mortgage credit book of business consisted of loans with a mark-to-market estimated loan-to-value ratio greater than 80%.

The proportion of higher risk mortgage loans that were originated *in the market* between 2003 and mid-2006 increased significantly. *As a result,* our purchase and securitization of loans that pose a higher credit risk, such as negative-amortizing adjustable-rate mortgages ("ARMs"), interest-only loans and subprime mortgage loans, *also increased, although to a lesser degree than many other institutions.* In addition, we increased the proportion of reduced documentation loans that we purchased to hold or to back our Fannie Mae MBS.

For example, negative-amortizing ARMs represented approximately 3% of our conventional single-family business volume in both 2005 and 2006. Interest-only ARMs represented approximately 9% of our conventional single-family business volume in both 2005 and 2006, and approximately 7% as of June 30, 2007. Negative amortizing ARMs and interest-only ARMs together represented approximately 6% of our conventional single-family mortgage credit book of business as of December 31, 2005, December 31, 2006, and June 30, 2007.

We also estimate that approximately 12% and 11% of our single-family mortgage credit book of business as of June 30, 2007 and December 31, 2006, respectively, consisted of Alt-A mortgage loans or structured Fannie Mae MBS backed by Alt-A mortgage loans, and approximately 1 % of our single-family mortgage credit book of business consisted of private-label mortgage-related securities backed by Alt-A mortgage loans, including

resecuritizations, as of both June 30, 2007 and December 31, 2006. We estimate that subprime loans represented approximately 2.2% of our single-family mortgage credit book of business as of both June 30, 2007 and December 31, 2006, of which approximately 0.2% consisted of subprime mortgage loans or structured Fannie Mae MBS backed by subprime mortgage loans and approximately 2% consisted of private-label mortgage-related securities backed by subprime mortgage loans, including resecuritizations.

We expect to experience increased delinquencies and credit losses in 2007 compared with 2006, and the increase in our exposure to credit risk resulting from our purchase or securitization of loans with higher credit risk may cause a further increase in the delinquencies and credit losses we experience. An increase in the delinquencies and credit losses we experience is *likely to reduce* our earnings during that period and also *could adversely affect* our financial condition.

123.    This report occurred at a critical moment, when Fannie Mae's Board and senior management had several years behind it of risky actions and policies, and stood on the eve of a final year of pushing in much deeper right at the bursting of the housing bubble. A prudent management would have known much more than this report stated, and would have told stockholders all that it knew. Yet this belated and inadequate disclosure both disguised, and left unmentioned, key aspects of the ruinous exposure to risk of the Fannie Mae actions and policies – both in the prior years, and, coming in the following year. Among its disguises and non-mentions:

a.    it did not separately address Fannie Mae's unprecedented level of investment in "private label" MBS backed by subprime mortgage holdings – perhaps the riskiest investment in the history of the Company;

b.    in its disguised mentions of the risks of the enormous quantities of "Alt-A" and other nontraditional mortgage holdings, it did not address how the risks

64

were magnified by combination with other factors (e.g., by the combination of mentioned low-documentation loans with unmentioned low borrower equity and unmentioned inflation of appraisals) ;

c. it did not address the risky nature of Fannie Mae's owning the new types of mortgage-related securities (e.g., collateralized debt obligations) likely to lose value rapidly, or to become completely illiquid – notwithstanding initially favorable ratings – once a period began of unfavorable economic and market developments;

d. it did not address inflated appraisals and other mortgage origination abuses, as detailed further below;

e. in mentioning its high LTV loans, which was one problem of low borrower equity, it did not separately address its swing away from requiring mortgage insurance and toward accepting "piggyback" loans, which greatly exacerbated the problem of low borrower equity;

f. it did not address how its high-risk lending, with aspects both mentioned and unmentioned, over-leveraged to a potentially ruinous degree its limited "hard"-asset net worth, disguising this by its unsound treatment of its "soft" assets;

g. it did not address the stark signals from the market, such as the downturn in the ABX index and the rising Federal Reserve's interest rates, that were rendering its accelerating high-risk lending increasingly imprudent.

124.     Defendants Mudd and Blakely signed and certified the August 16, 2007

Form 10-K as required under the Sarbanes-Oxley Act of 2002.  Additionally, defendants

Ashley, Beresford, Freeh, Hisey, Gaines, Horn, Macaskill, Pickett, Rahl, Smith, Swygert

and Wulff signed the filing.

125.     On September 25, 2007, the Board and senior management caused or

allowed Fannie Mae to issue a financial monthly summary for August 2007.  The summary

reported a gross mortgage portfolio balance of $728.9 billion.  The report, citing a survey

conducted by the Mortgage Bankers Association, reported that the serious delinquency rate

among subprime loans increased to a 4-year high of 9.27 percent during the second quarter

of 2007 and the delinquency rate among prime loans rose to a 9-year high of 0.98 percent.

The report, however, did not disclose the effects that this would have on Fannie Mae's

earnings. In particular, the summary reported as follows:

### MORTGAGE MARKET HIGHLIGHTS

- Pushed up by seasonal factors as well as the relative strength of the multifamily housing market, total residential mortgage debt outstanding (MDO) grew at a compound annual rate of 8.0 percent during the second quarter, accelerating from 7.4 percent in the first quarter, but down from 12.3 percent during the second quarter of 2006.

- According to the Mortgage Bankers Association's National Delinquency Survey, the serious delinquency (loans 90 or more days past due or in the process of foreclosure) rate among subprime loans increased to a 4-year high of 9.27 percent in the second quarter of 2007 while that for prime conventional loans rose to a 9-year high of 0.98 percent.

66

126.    However, the Board and senior management could not conceal the true dimensions of the Company's risk exposure for much longer.  On November 9, 2007, Fannie Mae issued its fiscal first quarter through third quarter 2007 quarterly reports on Forms 10-Q which revealed that Fannie Mae's earnings for the three quarters *declined 57%* compared to the same period in 2006.  Specifically, Fannie Mae reported that its net income of a mere $1.5 billion for the first three quarters of 2007 compared to $3.5 billion for the first three quarters of 2006.  In connection with these results, defendant Mudd admitted during an investor conference call that "the results we reported today reflect the correcting in the housing and mortgage markets, what they are going through right now. Those results, as I said, show that we *are not immune* to the current market conditions."

127.    On November 19, 2007, the *Associated Press* reported analyst concerns regarding a change in Fannie Mae's methodology for accounting for its annualized credit-loss ratio in its recent financial filings.  This accounting change resulted in Fannie Mae's reporting a much more favorable credit-loss ratio (the percentage of Fannie Mae's mortgages that lost value) than what it would have reported under its previous methodology.  These analysts questioned whether Fannie Mae was using the new methodology to soften the Company's reported exposure to the subprime mortgage crisis. In particular, the article reported:

> On Monday, Fannie Mae's shares, which hit a 10-year low last week, fell $3.11, or 7.6 percent, to $37.58 after Friedman Billings Ramsey analyst Paul J. Miller Jr. downgraded the company's shares to "Market Perform" from "Outperform" and reduced *his price target to $35 from $60.*

67

Fannie Mae's shares tumbled last week amid fears that a new accounting methodology disclosed by the company masks the number of bad loans it holds.

Fannie disclosed its new calculation for potential mortgage losses Nov. 9, when it submitted several hundred pages of documents to the Securities and Exchange Commission, bringing the company's financial reporting up to date for the first time since 2004.

But a bookkeeping change and its potential impact received significant attention last week, and Fannie executives held a conference call on Friday to explain the changes.

Using the new method, Fannie reported a so-called "annualized credit-loss ratio" of 0.04 percent for the first nine months of this year, meaning the value of four out of every 1,000 mortgages it holds declined during that period.

Under the company's old method, the credit-loss ratio for that period would have been 0.075 percent **--far exceeding Fannie's forecasts on the** $2.4 trillion worth of **mortgages it owns.**

As mortgage market turmoil continues, Fannie Mae's losses are likely to rise, Miller predicted. He forecast Fannie Mae's credit losses will rise as high as 0.15 percent in 2009, above the record high of 0.12 percent in the late 1980s.

128.    Moreover, even when Fannie Mae's accounting methodology has not changed,

the Company's accounting practices have served to obscure the true extent of the losses it has

faced and is facing.  For example, Fannie Mae's credit guarantee business now totals

approximately $2.4 trillion, and the amount the Company may have to pay out to make good

on any mortgage defaults to fulfill its guarantee obligations obviously looms as a potentially

huge liability.  The Company claims those obligations amount to $15.4 billion on its regular

balance sheet, but on its "fair value" balance sheet, which attempts to mark every asset and

liability to current market value, this liability is set at $20.6 billion.  Yet even this figure is not

trustworthy. Fannie Mae's competing government-sponsored enterprise, Freddie Mac, confronted the same issue of how to account for its guarantee obligations. Freddie Mac pegged those obligations at 1.5 percent of its book of credit guarantee business, which is *double* the 0.74 percent Fannie Mae applied to its book of guarantee business to calculate the same liability, and Freddie Mac's delinquency rate is actually lower than Fannie Mae's. As BARRON'S observed, "Had Fannie taken a similar hit, its fair-value net worth would've shrunk by some $20 billion to a paltry $16 billion, compared with its juiced-up regulatory capital of $45.4 billion."

129.    Furthermore, under the direction and management of the Board and senior management, in the fourth quarter of 2007 the Company wrote down its $74 billion holdings of privately packaged, non-agency subprime and Alt-A mortgage securities by 6%, or $4.6 billion, yet declared that only $1.4 billion of the write-down constituted a permanent impairment, the remainder being deemed a temporary loss due to market conditions. Neither senior management nor the Board has forecast how "temporary" a loss this is by explaining when they believe market conditions will so change that this sum will reappear on Fannie Mae's books. Here again, BARRON'S has put this maneuver into a revealing context: "Had Fannie charged off the remaining $3.2 billion, that would have torched most of the $3.9 billion in excess regulatory capital that it held at the end of the fourth quarter. Nearly all the major banks, from Merrill Lynch to UBS, have taken much larger percentage write-downs on their holdings of similar mortgage paper, and ran virtually all the losses through their income statements."

130.   BARRON'S recent analysis of Fannie Mae concludes with a disturbing

observation:

> In any event, continued deterioration since year end in indexes
> like the ABX triple-A index indicate that Fannie, based on the
> different vintages it owns, should conservatively take another $14
> billion charge, according to BARRON'S estimates. Fannie Mae says
> that since it's a long-term investor, it should incur no permanent
> decrease in asset value beyond what it has recognized.

> Yet using conservative default rates of 40% on its $133 billion
> subprime book, 12.5% on its $314 billion of Alt-A mortgages and 4%
> on its remaining $2 trillion of prime home mortgages, Fannie could
> well be facing cumulative credit losses of over $50 billion. That's
> after assuming Fannie will realize recoveries of 60% on its subprime
> and Alt-A loans and 70% on its prime loans.

131.   In sum, the statements and representations that the Board and senior

management caused Fannie Mae to make from early 2006 to near the end of 2007 in a

variety of contexts and forums failed to disclose and misrepresented the following material

adverse facts, which the Board and senior management knew, or consciously disregarded,

were reckless and grossly negligent in not knowing, or should have known:

(a)   Fannie Mae's mortgage credit book  was experiencing billions of dollars

worth of losses due to the subprime mortgage crisis; and

(b)   Fannie Mae's untimely financial reports did not even begin to adequately

report that exposure until after the Company's earnings had already declined by $2

billion, and even then continued to understate and disguise the losses and the high-risk

exposure.

### 3. INSIDER SELLING AND THE IMPROPER BUYBACK

132.    Defendants Mudd, Levin, Williams, Lund, Niculescu, Senhauster, Bacon, Knight, Blakely, Hisey and Picket ("Insider Selling Defendants"), because of their positions, knew that the statements the Company publicly made were incorrect. They also knew that the misstatements would create and were creating an inflated stock price. The Insider Selling Defendants took advantage of this undisclosed information they possessed to sell their personally held stock for considerably more than they were worth. While in possession of undisclosed material adverse information, the Insider Selling Defendants sold the following shares of Fannie Mae stock:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **BACON** | 10/2/2006 | 718 | $55.14 | $39,590.52 |
| | 1/24/2007 | 2,176 | $56.51 | $122,965.76 |
| | 3/12/2007 | 2,047 | $55.09 | $112,769.23 |
| | 10/1/2007 | 1,192 | $62.01 | $73,915.92 |
| | 11/5/2007 | 2,519 | $52.13 | $131,315.47 |
| | | **8,652** | | **$480,556.90** |
| **BLAKELY** | 1/24/2007 | 5,191 | $56.51 | $293,343.41 |
| | 1/30/2007 | 1,124 | $55.70 | $62,606.80 |
| | | **6,315** | | **$355,950.21** |
| **HISEY** | 1/3/2007 | 906 | $59.90 | $54,269.40 |
| | 1/24/2007 | 616 | $56.51 | $34,810.16 |
| | 3/12/2007 | 1,407 | $55.09 | $77,511.63 |
| | | **2,929** | | **$166,591.19** |
| **KNIGHT** | 10/2/2006 | 207 | $55.14 | $11,413.98 |
| | 11/20/2006 | 344 | $57.90 | $19,917.60 |
| | 1/24/2007 | 1,929 | $56.51 | $109,007.79 |
| | 3/12/2007 | 1,817 | $55.09 | $100,098.53 |
| | 10/1/2007 | 267 | $62.01 | $16,556.67 |
| | 11/5/2007 | 2,862 | $52.13 | $149,196.06 |

|  |  | 7,426 |  | $406,190.63 |
|---|---|---|---|---|
| **LEVIN** | 10/17/2006 | 25,240 | $57.91 | $1,461,648.40 |
|  | 1/23/2007 | 252 | $56.74 | $14,298.48 |
|  | 1/24/2007 | 6,917 | $56.51 | $390,879.67 |
|  | 3/12/2007 | 8,014 | $55.09 | $441,491.26 |
|  | 10/17/2007 | 41,524 | $62.99 | $2,615,596.76 |
|  | 11/5/2007 | 7,731 | $52.13 | $403,017.03 |
|  |  | **89,678** |  | **$5,326,931.60** |
| **LUND** | 10/2/2006 | 2,353 | $55.14 | $129,744.42 |
|  | 1/23/2007 | 142 | $56.74 | $8,057.08 |
|  | 1/24/2007 | 2,280 | $56.51 | $128,842.80 |
|  | 3/12/2007 | 1,567 | $55.09 | $86,326.03 |
|  | 10/1/2007 | 1,177 | $62.01 | $72,985.77 |
|  | 10/4/2007 | 4,666 | $67.18 | $313,461.88 |
|  | 11/5/2007 | 1,847 | $52.13 | $96,284.11 |
|  |  | **14,032** |  | **$835,702.09** |
| **MUDD** | 1/24/2007 | 14,775 | $56.51 | $834,935.25 |
|  | 3/12/2007 | 19,101 | $55.09 | $1,052,274.09 |
|  | 11/5/2007 | 8,730 | $52.13 | $455,094.90 |
|  |  | **42,606** |  | **$2,342,304.24** |
| **NICULESCU** | 11/20/2006 | 422 | $57.90 | $24,433.80 |
|  | 1/24/2007 | 2,653 | $56.51 | $149,921.03 |
|  | 3/12/2007 | 4,860 | $55.09 | $267,737.40 |
|  | 11/5/2007 | 4,527 | $52.13 | $235,992.51 |
|  |  | **12,462** |  | **$678,084.74** |
| **PICKETT** | 4/20/2007 | 2,904 | $58.81 | $170,784.24 |
|  |  | **2,904** |  | **$170,784.24** |
| **SENHAUSER** | 10/2/2006 | 269 | $55.14 | $14,832.66 |
|  | 1/18/2007 | 235 | $57.14 | $13,427.90 |
|  | 1/22/2007 | 110 | $56.82 | $6,250.20 |
|  | 1/23/2007 | 143 | $56.74 | $8,113.82 |
|  | 1/24/2007 | 488 | $56.51 | $27,576.88 |
|  | 1/24/2007 | 579 | $56.51 | $32,719.29 |
|  | 3/12/2007 | 1,215 | $55.09 | $66,934.35 |
|  | 6/13/2007 | 149 | $68.08 | $10,143.92 |

|          | 7/31/2007  | 3,609   | $60.73 | $219,174.57     |
|          | 10/4/2007  | 2,574   | $67.18 | $172,921.32     |
|          | 11/5/2007  | 1,111   | $52.13 | $57,916.43      |
|          |            | **10,482** |     | **$630,011.34** |
|          |            |         |        |                 |
| **WILLIAMS** | 10/17/2006 | 10,951 | $57.91 | $634,172.41 |
|          | 1/24/2007  | 5,299   | $56.51 | $299,446.49     |
|          | 3/12/2007  | 5,626   | $55.09 | $309,936.34     |
|          | 10/17/2007 | 10,736  | $62.99 | $676,260.64     |
|          | 11/5/2007  | 6,323   | $52.13 | $329,617.99     |
|          |            | **38,935** |     | $2,249,433.87   |
|          |            |         |        |                 |
| **TOTAL** |           | **240,184** |   | **$13,865,498.8**0 |
|          |            | **38,935** |     | $2,249,433.87   |

133.    On or about May 1, 2006 when the housing market was declining, the Board recklessly authorized the repurchase of up to $100 million of the Company's shares. Under the Board's authorization, while Fannie Mae's stock was artificially inflated due to the improper statements described above, the Company bought back over $2.6 million worth of the Company's own shares at an average price of approximately $59.32 per share, which is substantially higher than Fannie Mae's current share price of approximately $22.34 (closing price on June 23, 2008) per share and comparable to the $57.82 per share the Insider Selling Defendants averaged in selling their own Fannie Mae stock holdings during the same time period. On information and belief, in authorizing the buyback, the Board members failed to properly discuss and consider the subprime mortgage lending crisis and its effect on the Company's business prospects and, in particular, its liquidity. While Fannie Mae was repurchasing these shares, the Insider Selling Defendants made the sales described herein.

### 4. The Activities of WaMu, eAppraiseIt, First American, Countrywide, and LSI

73

134.    The independence and integrity of the real estate appraisers who determine the value of home loan collateral is of enormous importance. Real estate appraisals are intended to provide borrowers and lenders with an independent and accurate assessment of the value of a home. This ensures that a mortgage or home equity loan is not under-collateralized, which in turn protects borrowers from being overextended financially and lenders and investors from loss of value in a foreclosure proceeding.

135.    A mortgage lender, as part of agreeing to loan funds, must ensure that the borrower is able to repay the loan and that the loan is adequately collateralized in case the borrower defaults. The borrower and the lender have a common interest in accurately valuing the underlying collateral because both want to be sure the borrower is not over-paying for the property and would be able to meet the repayment terms, or that – in the event of default and foreclosure – the property value can support the loan.

136.    The secondary mortgage market, as described above, has radically transformed the incentives in the industry. Rather than holding the mortgage loans it makes – and so bearing the long-term consequences of poor loans – lenders commonly sell loans in the secondary mortgage markets. The loans are then pooled together, securitized, and sold as mortgage-backed securities to investment banks and entities such as Fannie Mae. The money that the lender receives for the sale of the mortgage loans or bonds is then used to finance new mortgages, increasing the lender's profits and fulfilling one of Fannie Mae's mandates, to re-cycle funds to the marketplace.

137.    The fact that the original lenders, such as WaMu and Countrywide, hold far fewer mortgages in their portfolios than ever before has had the effect of making the lenders less vigilant against risky loans since any risk is quickly transferred to the purchasers of the loans

74

such as Fannie Mae.  Moreover, as WaMu and Countrywide did not hold many of their residential mortgage loans in their portfolios, their interest in ensuring the accuracy of the purported appraisals backing such loans was severely diminished.  Even worse, because the profits of WaMu and Countrywide were and are determined by the quantity of loans they successfully closed, and not the quality of those loans, there has been an incentive for WaMu, Countrywide and other mortgage originators to pressure appraisers such as First American, eAppraiseIt and LSI to reach values that will allow the loans originated by them to close, whether or not the appraisals accurately reflect the homes' values.  The Company's senior management and Board, as well as defendants Killinger, Merlo and Mozilo, knew or should have known about the circumstances prevailing in the mortgage industry over the past several years including, *inter alia,* the practices of WaMu, First American, eAppraiseIt, Countrywide and LSI as described herein.

138.    Further jeopardizing the process, mortgage and real estate brokers as well as the lenders' loan production staffs (also known as "loan origination staffs") are almost always paid on commission.  Thus, the income of these individuals depends on whether a transaction closes and on the size of the transaction.  Accordingly, brokers and loan production staffs have strong personal incentives to pressure appraisers to value a home at the maximum possible amount, so that loans will close and generate maximum commissions, all of which facts were known or should have been known by the Company's senior management and Board as well as defendants Killinger, Merlo and Mozilo.  For these reasons, mortgage and real estate brokers and lenders such as WaMu and Countrywide frequently subjected real estate appraisers to intense pressure to change values in appraisal reports and/or to inflate the purported "values" therein

initially. In this environment, Fannie Mae and its senior management operated its "Desktop Underwriting" automated underwriting service purportedly to "assess" loans for purchase by Fannie Mae. WaMu (including defendant Killinger and its other senior officers), First American and eAppraiseIt (including defendant Merlo and its other senior officers), and Countrywide (including defendant Mozilo and its other senior officers) wrongfully and fraudulently took advantage of the lax or non-existent underwriting by the Company and its management, all of which was encouraged by and through defendants Mozilo and Killinger. In fact, Fannie Mae's failure to have in place more deliberate and careful underwriting of these underlying loans (including honest and independent appraisals), or insist upon it from loan originators such as WaMu and Countrywide, greatly contributed to its losses.

139.    The officers and directors of Fannie Mae also had a personal interest in not questioning – and in even inflating – the value of the loans Fannie Mae purchased. The value of these loans, as represented by their purported appraisals, serve as the basis for the value of the securities Fannie Mae creates by pooling these loans. The higher the value of the loans closed, the greater the price for which the securities into which they are pooled are sold on the secondary market, and the higher the apparent performance of Fannie Mae as measured by its share of the market. Further, in part to attempt to eradicate the stain on Fannie Mae's reputation and manufactured earnings of its earlier financial debacle, the Board and senior management sought to aggressively grow the Company and increase its reported earnings at virtually any cost.

140.    Moreover, the officers and directors of Fannie Mae also had a personal interest in not questioning – and in even inflating – the value of important types of loans Fannie Mae purchased from WaMu and Countrywide. Fannie Mae has statutory obligations to

purchase mortgages to meet "low and moderate income housing" and "special affordable housing" goals. These obligations mean that, both legally and practically (with respect to avoiding conflict with Congress), Fannie Mae must purchase mortgages for low-income families to authorize it to grow and to earn from its much larger-scale and more lucrative non-"affordable housing" activity. Inflated appraisals let Fannie Mae indulge in the fiction that the buyers of the affordable housing, who lacked funds for downpayments, nevertheless had low loan-to-value mortgages suitable for purchase by Fannie Mae, by inflating the "value" of the property.    It was much easier, in the short term, for Fannie Mae to meet the "affordable housing" goals with this help from inflated appraisals, and thereby to position itself to grow the non-affordable part of its business aggressively, than to do so without inflated appraisals.

141.    However, unlike the lenders, such as WaMu and Countrywide, who sell these loans to Fannie Mae, the Company, as described above, typically guarantees the payment of the principal and interest of the mortgages it pools into new securities.  As a result, Fannie Mae retains the credit risk of the mortgages underlying the securities it sells.  Inflating the value of a mortgage exacerbates this risk, for if the real value of a property falls below the amount of its mortgage, the borrower has an incentive to simply walk away from the loan and allow foreclosure on the property. The scale of the practices is shown by what a leading industry critic, Jonathan J. Miller, told THE WALL STREET JOURNAL on March 4, 2008: "'In my opinion, 70% to 80% of appraisals that were done during the housing boom are probably not worth the paper they're written on.' . . . . He estimate[d] that home values are overvalued nationwide by at least 10% because of inflated appraisals." Furthermore, inflated appraisals combined with Fannie Mae's other high-risk acts and policies as well as a lack of effective

risk management – such as investing in subprime MBS, buying mortgages with nontraditional terms, and allowing "piggyback" loans rather than mortgage insurance to address low borrower equity – to magnify the likelihood of widespread inadequate borrower equity and, hence, foreclosure, more than these acts and policies would have entailed separately.

142.    Thus, by accepting sub-standard mortgages from WaMu, Countrywide, and other originators based upon exaggerated and/or simply unreal "appraisals" from First American, eAppraiseIt and LSI, which defendants Killinger, Merlo and Mozilo knew or should have known were being generated, Fannie Mae was caused enormous damages when the underlying borrowers could not pay the interest and principal when due and there was insufficient collateral to cover their obligations to the Company.

143.    Thus, Fannie Mae and its shareholders have a vital interest in the accurate appraisal of the loans the Company buys and, in turn, re-packages for sale to others.

144.    Because of the importance of accurate appraisals in the home lending market, the Uniform Standards of Professional Appraisal Practice ("USPAP") requires appraisers to conduct their appraisals independently: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests. In appraisal practice, an appraiser must not perform as an advocate for any party or issue." USPAP is incorporated into federal law. *See* 12 C.F.R. § 34.44.

145.    Additionally, Federal law sets independence standards for appraisers involved in federally regulated transactions. *See* 12 U.S.C. §§ 3331 *et seq.* The Code of Federal Regulations provides that an in-house or "staff" appraiser at a bank "must be independent of the lending, investment, and collection functions and not involved, except as an appraiser, in the

federally related transaction, and have no direct or indirect interest, financial or otherwise, in the property." 12 C.F.R. § 34.45. For appraisers who are independent contractors or "fee" appraisers, the regulation states that "the appraiser shall be engaged directly by the regulated institution or its agent, and have no direct or indirect interest, financial or otherwise, in the property transaction." 12 C.F.R. § 34.45.

146.     WaMu hired eAppraiseIt in the Spring 2006, along with eAppraiseIt's top competitor, to oversee the appraisal process for its loans, many of which were passed on to Fannie Mae. Since being hired by WaMu, eAppraiseIt and First American have made a practice of violating professional and federal independence requirements with regard to appraisals performed for WaMu and, thus, indirectly for Fannie Mae.

147.     Initially, eAppraiseIt hired approximately 50 former WaMu employees as staff appraisers and Appraisal Business Managers ("ABMs") and - at WaMu's request - gave the ABMs the authority to override and revise the values reached by third-party appraisers. One-third of eAppraiseIt's staff appraisers were former WaMu employees, and all of the ABMs were former WaMu employees.

148.     Almost from the beginning of eAppraiseIt's work for WaMu, WaMu's loan production staff began complaining that the appraisal values provided by eAppraiseIt's appraisers were too low. It was clear, and eAppraiseIt and First American well understood, that WaMu's dissatisfaction was largely due to the fact that eAppraiseIt's staff and fee appraisers were not "hitting value," that is, were appraising homes at a value too low to permit loans to close and be passed along to Fannie Mae and others.

149.     During this period, First American was seeking additional business from WaMu in other areas. WaMu, with the apparent knowledge of defendant Killinger, expressly conditioned giving any future business to First American on success with eAppraiseIt appraisals.

150.     In February 2007, eAppraiseIt acceded to WaMu demands, under pressure generated by defendant Killinger, that eAppraiseIt stop using its usual panels of staff and fee appraisers to perform WaMu appraisals and instead use a "Proven Panel" of appraisers selected by WaMu's loan origination staff. Appraisers on the Proven Panel were selected because they reliably "came in on value," that is, they provided high values, particularly in loans to be packaged for Fannie Mae and Freddie Mac. In the words of eAppraiseIt's President, defendant Merlo, in a February 22, 2007 email to other executives of his company: "we have agreed to roll over and just do it."

151.     Due to the failure of the federal Office of Thrift Supervision, its purported regulator charged with overseeing its operations, to intercede, WaMu not only had complete control over eAppraiseIt's appraiser panel, but WaMu's loan officers at times also directly selected specific individual appraisers on the panel to conduct their appraisals. eAppraiseIt also permitted WaMu's loan origination staff to remove appraisers from the panel on the grounds that such appraisers consistently valued properties lower than WaMu's desired target amounts. Moreover, eAppraiseIt permitted WaMu loan officers to communicate directly with eAppraiseIt's ABMs and Appraisal Specialists by telephone and email to discuss appraisal values. At all such times, all such WaMu employees were subject to defendant Killinger's oversight and direction.

152.    eAppraiseIt's management (including defendant Merlo), as well as WaMu (including defendant Killinger) and the Company's senior management and Board knew or should have known or otherwise understood that these arrangements with WaMu violated professional and federal appraiser independence rules and resulted in over-valued properties. As eAppraiseIt's Executive Vice President explained in an email to other members of senior management while discussing a particular reconsideration of an appraised value: "The original appraiser was a WaMu proven appraiser coming in $750,000 higher than the eAppraiseIt review appraiser. This is a good example of ... our concerns about over-valued properties."

153.    eAppraiseIt's management, including defendant Merlo, repeatedly informed First American's senior management of their concerns regarding the illegal arrangements with WaMu. First American instructed defendant Merlo and other eAppraiseIt executives to continue its corrupt business relationship with WaMu, all of which was known or could have been known with reasonable diligence by the Company's senior management and Board.

154.    Based on this wrongful conduct, the State of New York has sued First American and eAppraiseIt for engaging in deceptive, fraudulent, and illegal businesses practices under New York law. In the wake thereof, Fannie Mae has reached an agreement with New York Attorney General Andrew Cuomo, announced March 3, 2008, providing for, *inter alia,* the appointment of an independent examiner, the Independent Valuation Protection Institute, to examine the appraisal practices cited in the Attorney General's complaint and provide greater scrutiny of appraisals forming the basis for loans to be purchased by the Company, such scrutiny to be provided under the auspices of OFHEO beginning in January, 2009. The agreement provides for a code of conduct, the Home Valuation Protection Code, which bars lenders such as WaMu from

81

pressuring appraisers inflated estimates of property values, bars lenders from using appraisals ordered by mortgage brokers and reinforces the notion that the appraisers be independent of the lenders. Plaintiff further believes that other investigations are underway which will lead to enforcement or other actions against WaMu by federal banking regulators and state actions against First American and eAppraiseIt.

155.    Similarly, although LSI was nominally a separate corporate entity from Countrywide and its loan originating entities, upon information and belief, LSI accommodated Countrywide's appraisal needs and generated artificially high and unjustified appraisals for, *inter alia,* the mortgages packaged and sold to Fannie Mae, causing it substantial damages as described herein.

156.    This wrongful conduct by WaMu, First American, eAppraiseIt, Countrywide, LSI and their senior executives, including defendants Killinger, Merlo and Mozilo, has resulted in the over-valuation of an unknown volume of loans purchased by the Company from WaMu and Countrywide in Fannie Mae's portfolio and in the mortgage-backed securities Fannie Mae has sold and guaranteed, all of which has caused and will continue to cause the Company substantial damages.

157.    Fannie Mae's Board and management knew, or should have known, of these wrongful practices by WaMu and Countrywide, lenders with which Fannie Mae had a significant and continuing business relationship and from which Fannie Mae purchased billions of dollars of loans. Fannie Mae's awareness of such practices is attested by how readily in 2007-2008 it reached agreement with the New York Attorney General to change the practices.   Yet, that same agreement shows that Fannie Mae's board and officers vastly

preferred to close their eyes to the enormous damage from those practices in the past, apparently because a full exploration of them would reveal what they had let happen on their watch, and just to agree to lock the barn door after the horses had escaped.

158.    Fannie Mae's Board and management may not shrug off these practices as something long unchanged in the industry or something over which it had no influence. As INVESTMENT DEALERS DIGEST reported on August 13, 2007, "Starting in late 2005 and throughout 2006, a wide range of housing finance professionals agree, credit lending standards in housing finance slumped to their worst." Conversely, as soon as Fannie Mae (and Freddie Mac), agreed with the New York Attorney General to a code against inflated appraisals, as THE WALL STREET JOURNAL reported on March 4, 2008, "Because Fannie and Freddie are the dominant sources of funds for home loans, the code will become an effective standard for the industry."

### D. THE NECESSITY OF THIS DERIVATIVE ACTION

159.    On November 29, 2007, as required by Rule 23.1 of the Federal Rules of Civil Procedure, plaintiff, through his legal counsel, made a written demand on the Fannie Mae Board to, *inter alia,* pursue through litigation the claims alleged in this action and name as defendants those identified above, among others responsible for the wrongdoing and damages caused to Fannie Mae as described herein. A copy of that letter is attached hereto as Exhibit "A." The Board neither responded to that demand nor took the actions demanded. The Board, in a further waste of corporate assets, has appointed a sham "Special Committee" of culpable directors to create the appearance of activity virtually identical in purpose to one created in response to the Company's earlier financial debacle (i.e. the Pre-2005 Claims), when such

committee did nothing of substance in three years of existence. The present mandate of the "Special Committee" and its counsel is nothing more than an effort to seek the dismissal of claims asserted derivatively by shareholders of the Company. Accordingly, plaintiff's demand to sue the defendants named herein was effectively rejected by the Board.

160.    Although chartered by Congress to oversee and regulate Fannie Mae, Freddie Mac, and other government-sponsored enterprises, OFHEO as a matter of law does not have exclusive authority to protect the interests of Fannie Mae, its shareholders or otherwise address the wrongdoing at issue here. OFHEO has never claimed for itself, nor acted as if it had, exclusive authority to protect the corporate interests of Fannie Mae or its shareholders in the face of conduct by its officers or directors that breach their fiduciary duties to Fannie Mae and its shareholders. In fact, OFHEO has utterly failed in its oversight of Fannie Mae and it bears some of the responsibility for the debacle that ensued as a result of such failure.

161.    As a matter of fact, OFHEO has proven to be such a toothless and ineffectual regulator that bipartisan legislation has been pending in Congress to abolish OFHEO and replace it with a stronger regulator with ample oversight powers. The conduct described above occurred on OFHEO's watch, yet OFHEO not only failed to detect it, but in many cases acquiesced in the wrongdoing. Indeed, OFHEO only launched its investigation of Fannie Mae after similar conduct – also undetected by OFHEO – came to light at Freddie Mac.

162.    In the prior Freddie Mac shareholder derivative litigation (MDL No. 1584, S.D.N.Y.), commenced in the wake of the public exposure of Freddie Mac's undetected accounting fraud, the derivative plaintiffs there played a major role in the recovery of $99 million from its officers and directors as well as co-conspirators for the benefit of Freddie Mac,

84

as well as substantial therapeutic and corporate governance improvements. OFHEO, on the other hand, levied a $125 million penalty *against* Freddie Mac, and its efforts to recoup any of that penalty from responsible Freddie Mac senior executives has, after more than three years of litigation, recovered relatively little for it or its shareholders. Similarly OFHEO and the SEC have in the past extracted a $400 million penalty *from* the Company due to the violations of fiduciary duties and fraudulent accounting manipulations of Fannie Mae's officers and directors, but such regulatory action has produced nothing for the Company's benefit.

163.     Accordingly, this derivative action is both legally proper and factually necessary.

## CAUSES OF ACTION

## COUNT I

## VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 14A-9 PROMULGATED THEREUNDER

164.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

165.     This Count is asserted by plaintiff against the members of the Company's Board of Directors on April 4, 2008 (the "2008 Directors") for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder as controlling persons of Fannie Mae in connection with the Company's Proxy Statement disseminated on behalf of the Board on April 4, 2008 in connection with the Company's Annual Meeting of Shareholders scheduled and ultimately held on May 20, 2008. At all relevant times to this Count, the 2008 Directors were controlling persons of Fannie Mae under and pursuant to

Section 20 of the Exchange Act inasmuch as they had the power to control all aspects of the Company's business including, *inter alia*, those documents issued and disseminated in its name.

166.    The Proxy Statement solicited the votes of plaintiff and the other Fannie Mae shareholders in connection with, *inter alia*, the re-election of certain of 12 of the sitting directors of the Company. The Proxy Statement issued and disseminated to plaintiff and all other Fannie Mae shareholders purported to describe the activities of the Company's Board and the committees thereof in the preceding year, setting forth, *inter alia*, the number of meetings held and what certain of such committees purportedly accomplished.

167.    Most significantly, the Proxy Statement at page 8 *et seq* discussed the Board's corporate governance, the purported independence of its members and other matters bearing upon the qualifications of the 2008 Directors who were seeking re-election through the means of the Proxy Statement. In connection therewith, the Proxy Statement deceptively stated:

> "The Board and Management of Fannie Mae continually moniter the latest developments in corporate governance, as well as the most recent laws, rules and regulations so that the Company adopts **the latest and best corporate governance practices**."    [emphasis added]

168.    The Proxy Statement contained untrue statements of material fact and omitted other facts necessary to make the statements made not misleading, all of which conduct was in violation of §14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC. In particular, the above-quoted statement was blatantly false inasmuch as, *inter alia*, each member of the Company's Board of Directors knew that

Fannie Mae was not following OFHEO's guidelines for its operations, that its financial statements and releases to the public materially concealed the Company's deteriorated financial and operating condition in violation of the federal securities laws and otherwise. In this context, the Proxy Statement failed to disclose the extent to which the nominees for re-election to the Board were responsible for the wrongdoing that caused the Company to be damaged as described herein and to be exposed to billions of dollars in fines, restitution, verdicts in litigation and other damages.

169.    Indeed, as reported by OFHEO in its May 2006 Report cited above at ¶ 7, the members of Fannie Mae's Board of Directors at the time, including those who remained among the 2008 Directors (in particular, defendants Mudd, Ashley and Swygert), had failed abjectly in their corporate governance including their failure to follow OFHEO's own guidelines and directions, which failures continued through and including the issuance and dissemination of the Proxy Statement. Among OFHEO's criticisms of Fannie Mae's Board were the following comments going to the core of their fiduciary responsibilities as directors:

- Fannie Mae's Board of Directors contributed to those problems by failing to be sufficiently informed and to act independently of its chairman, Franklin Raines, and other senior executives; by failing to exercise the requisite oversight over the [Company's] operations; and by failing to discover or ensure the correction of a wide variety of unsafe and unsound practices.

- The Board's failures continued in the wake of revelations of accounting problems and improper earnings management at Freddie Mac and other high profile firms, the initiation of OFHEO's special examination, and credible allegations of improper earnings management made by an employee of the [Company's] Office of the Controller.

87

170.    The Proxy Statement failed to disclose that, while these pointed comments were made to Fannie Mae's Board less than two years earlier, other than the reference to defendant Raines, the Board's governance of Fannie Mae had not changed materially despite the proclamations of its members that they would adopt and adhere to "the latest and best corporate governance practices."

171.    The 2008 Directors went on to state as to the issue of their own independence:

>    "We believe that a central component of good corporate governance is having a Board that is composed a substantial majority of directors who are independent from management."

172.    The 2008 Directors went on to describe some of the characteristics of their purported independence from management while concealing the fact that none of them were or could be considered "independent" once they had colluded with defendant Mudd and other members of the Company's senior management to conceal Fannie Mae's true financial and operating condition as described above. In effectively becoming a "band of brothers" committed to concealing their own failures from Fannie Mae's shareholders, the independence the 2008 Directors projected in the Proxy Statement was (and is) simply an illusion.

173.    At page 17 of the Proxy Statement, the 2008 Directors set forth what they maintain were and are the principal qualifications for an individual to serve on Fannie Mae's Board. In particular, they state, *inter alia* :

>    "The Board, as a group, must be knowledgeable in business, finance, capital markets, accounting, risk management, public policy, mortgage lending,

88

real estate, low-income housing, homebuilding, regulation of financial institutions, and any other areas that may be relevant to the safe and sound operation of Fannie Mae."

174.    Such statement was made by the 2008 Directors to imply that they were well-equipped to deal with the complexity and challenges of Fannie Mae's business operations and environment, when they were not. In fact, notwithstanding such statement, the presidential appointees to the Board were made to reward political loyalty and most members of Fannie Mae's Board were sorely lacking in the knowledge and experiences necessary for the "safe and sound operation of Fannie Mae."

175.    The 2008 Directors go on to state:

"In considering members of the Board for re-nomination, the Nominating and Corporate Governance Committee [of the Board] takes into consideration: a director's previous contribution to the effective functioning of Fannie Mae…"

176.    In fact, such Committee did not make any such evaluation as to each or any of the 12 nominees for re-election to the Board nor did it perform (nor could it perform) any objective evaluation of them as appropriate for re-nomination.

177.    The Proxy Statement goes on to state, at page 18:

"There is one fewer nominee for director than the number of directors to be elected by shareholders…because we are still engaged in the process of identifying an appropriate and qualified candidate."

178.    In fact, in making such statement, the 2008 Directors fail to disclose that such person is being sought by management and counsel to the so-called "Special Committee" of the Board to be appointed to such Committee' purportedly for the purpose of providing some level of purported independence in connection with the demands made on

89

Fannie Mae's Board by shareholders such as plaintiff Agnes and others and to serve as a

pretext to seek the dismissal of this and other shareholder derivative litigation. Similarly, in

this context and otherwise, the 2008 Directors fail to include in the Proxy Statement neither

the content nor substance of the demands made by plaintiff and others, the import of them

and what, in particular, Fannie Mae's directors have done or not done in response thereto.

179.     In connection with the 2008 Directors descriptions of the various

Committees of the Board, they described what the Board's Audit Committee and was

supposed to do at page 23 of the Proxy Statement:

> "The *Audit Committee* oversees:
>
> + our accounting, reporting and financial practices, including the integrity of our
>
> financial statements and internal control over financial reporting;
>
> + our compliance with legal and regulatory requirements (in coordination with the
>
> Compliance Committee);
>
> + the qualifications and independence of our outside auditors; and
>
> + the performance of our internal audit function and our outside auditor."

180.     The foregoing statements, in the context of the facts alleged above, were

deceptive and made with the objective of misleading the shareholders of Fannie Mae. Such

statements made by the 2008 Directors failed to disclose that, in fact, the members of the

Audit Committee, despite their many meetings in 2007, failed to require that the Company's

financial statements were prepared in accordance with GAAP and the purported audits

thereof by Deloitte & Touche, LLP "(Deloitte")" were not conducted in compliance with

GAAS. Indeed, each of the members of Fannie Mae's Audit Committee knew or should

have known as of the date of the Proxy Statement that the Company's financial statements as of December 31, 2007, materially overstated its financial and operating condition, understated by material amounts its contingent liabilities and failed to amply provide for loan losses and asset reductions as provided more fully above.

181.    Such statements also failed to disclose the extent to which Deloitte and OFHEO had pointed out to the Company's Board, including the members of the Audit Committee, material shortcomings in Fannie Mae's internal audit and risk management functions thus leading to the issuance and dissemination of its false and misleading 2007 financial statements concurrently with the Proxy Statement. Similarly, the Audit Committee's Report, signed by defendants Beresford, Ashley, Horn, Smith and Wulff, appearing at pages 58 and 59 of the Proxy Statement, was equally deceptive for the foregoing reasons.

182.    As a result of the use by the Company's Board of Directors of the Proxy Statement to solicit the votes of plaintiff and other Fannie Mae shareholders, which Proxy Statement failed to disclose the material facts set forth herein, the Board's nominees for re-election were approved. By utilizing such Proxy Statement, the suffrage rights of plaintiff and each other shareholder of the Company have been violated, which conduct is in violation of Section 14 (a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

## COUNT II

### BREACH OF FIDUCIARY DUTY BY OFFICER AND DIRECTOR DEFENDANTS WITH RESPECT TO PRE-2005 CLAIMS

91

183.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

184.    Each officer and director defendant owed Fannie Mae and its shareholders the highest fiduciary duties of loyalty, honesty, and care in conducting the Company's affairs.

185.    Defendants Raines, Howard, Mudd, Spencer, Ashley, Duberstein, Malek, Mulcahy, and Swygert knowingly, intentionally, recklessly or negligently breached his or her fiduciary and other duties owed to Fannie Mae and its shareholders and, thereby, caused the Company to waste its assets, expend corporate funds, suffer from the effect of remedial measures imposed and to be imposed upon the Company by regulators, and impair its reputation and credibility for no legitimate business purpose, as a result of which Fannie Mae has been and continues to be substantially damaged. These defendants knew or should have known that the Company's financial statements were not prepared in conformity with GAAP and that the purported audits of those financial statements by KPMG during the relevant period were not carried out in accordance with GAAS. Indeed, despite the increased attention paid to the accuracy of Fannie Mae's financial statements and the procedures implemented in the wake of the settlement with OFHEO and the SEC, the Company's assets, earnings and net worth continue to be overstated by material amounts as a result of the inadequacy of its reserves, even after reporting a loss of $2.2 billion for the quarter ended March 31, 2008.

186.    Accordingly, plaintiff on behalf of Fannie Mae and its shareholders seeks from defendants Raines, Howard, Mudd, Spencer, Ashley, Duberstein, Malek, Mulcahy, and Swygert monetary damages, injunctive remedies, and other forms of equitable relief.

## COUNT III

92

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
## WITH RESPECT TO PRE-2005 CLAIMS BY GOLDMAN SACHS

187.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

188.    Defendant Goldman Sachs knowingly, intentionally, or recklessly designed and implemented sham transactions for the purpose of shifting Fannie Mae's income to different accounting periods, and knowingly, intentionally, or recklessly failed to make truthful, complete, or appropriate disclosures concerning those transactions, as set out above.  Goldman Sachs acted in such manner with the knowledge that by engaging in sham transactions with Fannie Mae officers, such officers were breaching fiduciary duties owed by them to Fannie and its shareholders.

189.    As a result of these wrongful actions, defendant Goldman Sachs aided and abetted the breaches of fiduciary and other duties by the officer and director defendants as well as their colleagues.

190.    As a result of defendant Goldman Sachs' aiding and abetting the breaches of fiduciary and other duties by the officer and director defendants, Fannie Mae has been and continues to be substantially damaged.

191.    Accordingly, plaintiff on behalf of Fannie Mae and its shareholders, seeks from defendant Goldman Sachs monetary damages, injunctive remedies, and other forms of equitable relief.

## COUNT IV

### INDEMNIFICATION FROM OFFICER AND DIRECTOR DEFENDANTS WITH RESPECT TO PRE-2005 CLAIMS

192.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

193.    Defendants Raines, Howard, Mudd, Spencer, Ashley, Duberstein, Malek, Mulcahy, and Swygert, as agents of Fannie Mae, breached their fiduciary and other duties to Fannie Mae and its shareholders, as set out above.

194.    Fannie Mae has suffered and will suffer significant and substantial injury as a direct result of these breaches of the fiduciary and other duties owed to it.  Part of that injury suffered by Fannie Mae as a result of this wrongdoing by these defendants may be liability to investors, OFHEO and others.

195.    Accordingly, plaintiff, on behalf of Fannie Mae and its shareholders, seeks from defendants Raines, Howard, Mudd, Spencer, Ashley, Duberstein, Malek, Mulcahy, and Swygert complete and full indemnification to the extent Fannie Mae is found liable for the wrongdoing of these defendants and those who acted wrongfully together with them.

## COUNT V

### BREACH OF CONTRACT BY GOLDMAN SACHS WITH RESPECT TO PRE-2005 CLAIMS

196.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

197.    Defendant Goldman Sachs, as the underwriter/dealer for the transactions establishing the REMIC Trusts, was contractually and professionally obligated to provide

94

the Company these services consistent with GAAP, with legal and regulatory requirements mandating truthful, complete, and appropriate public disclosures concerning these transactions, and with the law generally.

198.     Defendant Goldman Sachs failed to provide to Fannie Mae the services it was paid for and contractually obligated to provide to the Company, as set out above and, further, failed to perform its contractual obligations to Fannie Mae fairly and in good faith. Goldman Sachs not only kept the compensation that it received directly and indirectly as a result of its wrongdoing but invested the proceeds thereof and received additional unjust enrichment.

199.     As a result of these breaches of contract, as well as its unjust enrichment in connection therewith, Fannie Mae was substantially damaged in an amount presently unknown.

200.     Accordingly, plaintiff on behalf of Fannie Mae and its shareholders, seeks from defendant Goldman Sachs monetary damages.

### COUNT VI

#### NEGLIGENCE OF OFFICERS AND DIRECTORS
#### WITH RESPECT TO PRE-2005 CLAIMS

201.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

202.     Defendants Raines, Howard, Mudd, Spencer, Ashley, Duberstein, Malek, Mulcahy, and Swygert were negligent in the performance of his or her responsibilities for

95

the management and governance of Fannie Mae, as a result of which the Company was substantially damaged in an amount presently unknown.

203.    Accordingly, plaintiff, on behalf of Fannie Mae and its shareholders, seeks from defendants Raines, Howard, Mudd, Spencer, Ashley, Duberstein, Malek, Mulcahy, and Swygert monetary damages.

## COUNT VII

### VIOLATIONS OF SARBANES-OXLEY BY RAINES AND HOWARD WITH RESPECT TO PRE-2005 CLAIMS

204.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

205.    Defendants Raines and Howard, as Chief Executive Officer and Chief Financial Officer, respectively, signed off on the financial statements of Fannie Mae and, as such, were personally responsible for the accuracy thereof.

206.    Such financial statements materially overstated the assets, earnings, and net worth of Fannie Mae, and defendants Raines and Howard knowingly engaged in misconduct when they approved them.

207.    Pursuant to Section 304 of Sarbanes-Oxley, defendants Raines and Howard should be required to surrender to the Company all compensation or other benefits paid or arguably payable by Fannie Mae that were based upon or otherwise tied to its financial statements that were materially false.

## COUNT VIII

### UNJUST ENRICHMENT OF OFFICER AND DIRECTOR DEFENDANTS

### WITH RESPECT TO PRE-2005 CLAIMS

208.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

209.    Defendants Raines, Howard, Mudd, Spencer, Ashley, Duberstein, Malek, Mulcahy, and Swygert were unjustly enriched by the payments made to them as compensation and otherwise by the Company.

210.    Defendant Raines, from 1998 through 2004, while engaged in the wrongdoing set forth above, received $22.6 million in salary and bonuses from Fannie Mae, plus $62 million in options and stock awards, and, in 2004, $200,000 for his use of corporate aircraft.  Defendant Raines unjustly, and indirectly at the expense of Fannie Mae, received improper "Friends of Angelo" personal below-market mortgages from defendant Countrywide and was unjustly enriched thereby.

211.    Such special treatment by a company with which Fannie Mae violated the Company's "Code of Conduct" for its employees, which underscores that "we seek to avoid any actual or apparent conflict between Fannie Mae's business interests and our own personal interests or those of relatives or associates."  Similarly, Fannie Mae's "Conflicts of Interest Policy for Members of the Board of Directors" provides:

> A conflict of interest arises when a person's private interest interferes in any way—or even appears to interfere—with the interests of the Corporation as a whole. A conflict can arise when a director takes actions or has interests that make it difficult to perform his or her work objectively and effectively for the Corporation. Conflicts of interest also arise when a director, or a member of his or her immediate family, receives improper personal benefits as a result of his or her status as a director of the Corporation. Any situation that involves, or appears to involve, a conflict of interest must be

disclosed to the Governance Committee Chair or another member of
the Governance Committee.

212.       That Conflict of Interest Policy goes on to command that "[a] director, or
any member of his or her immediate family, should not offer, solicit or accept gifts in those
instances where the gift is being made in order to influence the director's actions as a
Corporation Board member, or where the offer, solicitation or acceptance of such gift gives
the appearance of a conflict of interest." In no uncertain terms this Policy states that "[i]t is
imperative that all directors, whether appointed or elected, exercise good faith by disclosing
information relating to conflicts or potential conflicts of interest."

213.       Indeed, a Fannie Mae spokesman, quoted by THE WALL STREET JOURNAL,
explained that Fannie Mae's Code of Conduct "requires the disclosure of potential conflicts
of interest and prohibits acceptance of substantial gifts, including loan with preferential
terms, from an organization seeking to do business with the company without prior review
and approval by the company."

214.       Clearly, defendant Raines did not comply with Fannie Mae's conflicts of
interest rules and procedures -- indeed, he did not even manifest the elementary "good faith"
those rules expect -- by failing to disclose and get advance Company approval of his "Friend
of Angelo" loans from Countrywide.

215.       Defendant Howard, while engaged in the wrongdoing set forth above,
received $7.7 million in salary and bonuses and $21.8 million in options and stock awards
from Fannie Mae in those years.

98

216.    Defendants Mudd and Spencer also received millions of dollars in bonuses and "incentive" payments that were unearned and based upon the artificially inflated earnings caused and/or acquiesced in by Fannie Mae's Board.

217.    Throughout the relevant period, defendants Ashley, Duberstein, Malek, Mulcahy, and Swygert were paid substantial fees for attending meetings and otherwise occupying positions as directors of Fannie Mae. All of such payments and fees as well as other benefits were unearned and unjustified since these directors so utterly failed to fulfill their responsibilities for the management and governance of the Company.

218.    Defendants Raines, Howard, Mudd, Spencer, Ashley, Duberstein, Malek, Mulcahy, and Swygert not only received but retained the funds unjustly received and invested such funds, thereby receiving additional unjust enrichment.

219.    As a result of the foregoing unjust enrichment, defendants Raines, Howard, Mudd, Spencer, Ashley, Duberstein, Malek, Mulcahy, and Swygert should be required to repay to Fannie Mae the respective amounts paid plus interest based upon each of these defendants' investment and retention of the proceeds of their unjust enrichment.

**COUNT IX**

**BREACH OF FIDUCIARY DUTY BY OFFICER AND DIRECTOR DEFENDANTS WITH RESPECT TO SUBPRIME CLAIMS**

220.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

221.    The Subprime Defendants owed Fannie Mae and its shareholders the highest fiduciary duties of loyalty, honesty, and care in conducting the Company's affairs.    Each

owed Fannie Mae and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

222.    As officers and directors of a publicly held company, Fannie Mae's officers and directors had and have a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections, forecasts as well as other material facts bearing upon its operations and financial condition.

223.    As a result of the actions and omissions set out above, each Subprime Defendant knowingly, intentionally, recklessly or negligently breached his or her fiduciary and other duties owed to Fannie Mae and its shareholders and, thereby, caused the Company to waste its assets, expend corporate funds, suffer from the effect of remedial measures imposed and to be imposed upon the Company by regulators, and impair its reputation and credibility for no legitimate business purpose, as a result of which Fannie Mae has been and continues to be substantially damaged.

224.    Accordingly, plaintiff, on behalf of Fannie Mae and its shareholders seeks from the Subprime Defendants monetary damages, injunctive remedies, and other forms of equitable relief.

<u>COUNT X</u>

<u>BREACH OF FIDUCIARY DUTY BY DEFENDANTS MUDD, LEVIN, WILLIAMS, LUND, NICULESCU, SENHAUSER, BACON, KNIGHT, BLAKELY, HISEY, AND PICKETT FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION WITH RESPECT TO THE SUBPRIME CLAIMS</u>

225.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

226.    At the time of the stock sales set forth herein, defendants Mudd, Levin, Williams, Lund, Niculescu, Senhauser, Bacon, Knight, Blakely, Kisey and Pickett knew the information described above, and sold Fannie Mae common stock on the basis of such information.

227.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which these defendants used for their own benefit when they sold Fannie Mae common stock.

228.    At the time of their stock sales, these defendants knew that Fannie Mae was exposed to the subprime mortgage crisis and that the Company's statements at that time concealed the full extent of that exposure and materially misrepresent the Company's financial condition.  These defendants' sales of Fannie Mae common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

229.    Since the use of the Company's proprietary information for their own gain constitutes a breach of these defendants' fiduciary duties owed to the Company and its

shareholders, the Company is entitled to the imposition of a constructive trust on any profits defendants Mudd, Levin, Williams, Lund, Niculescu, Senhauser, Bacon, Knight, Blakely, Kisey or Pickett obtained thereby.

## COUNT XI

### INDEMNIFICATION FROM OFFICER AND DIRECTOR DEFENDANTS WITH RESPECT TO SUBPRIME CLAIMS

230.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

231.    The Subprime Defendants, as fiduciaries and agents of Fannie Mae, breached their fiduciary and other duties to Fannie Mae and its shareholders, as set out above.

232.    Fannie Mae has suffered and will suffer significant and substantial injury as a direct result of these breaches of the fiduciary and other duties owed to it.  Part of that injury suffered by Fannie Mae as a result of this wrongdoing by the Subprime Defendants may be liability to investors, OFHEO and others.

233.    Accordingly, plaintiff, on behalf of Fannie Mae and its shareholders, seeks from the Subprime Defendants complete and full indemnification to the extent Fannie Mae is found liable for the wrongdoing of these defendants and those who acted wrongfully together with them.

## COUNT XII

### NEGLIGENCE OF OFFICERS AND DIRECTORS WITH RESPECT TO SUBPRIME CLAIMS

234.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

235.    Each Subprime Defendants was negligent in the performance of his or her responsibilities for the management and governance of Fannie Mae, as a result of which the Company was and will continue to be substantially damaged in an amount presently unknown.

236.    Accordingly, plaintiff, on behalf of Fannie Mae and its shareholders, seeks from the Subprime Defendants monetary damages.

### COUNT XIII

### VIOLATIONS OF SARBANES-OXLEY BY MUDD AND LEVIN WITH RESPECT TO SUBPRIME CLAIMS

237.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

238.    Defendant Mudd, as Chief Executive Officer, and defendant Levin, as Chief Financial Officer and Interim Chief Financial Officer, signed off on the financial statements of Fannie Mae and, as such, were personally responsible for the accuracy thereof.

239.    Such financial statements materially overstated the assets, earnings, and net worth of Fannie Mae, and defendants Mudd and Levin engaged in misconduct when they approved them.

240.    Pursuant to Section 304 of Sarbanes-Oxley, defendants Mudd and Levin should be required to surrender to the Company all compensation or other benefits paid or arguably payable by Fannie Mae that were based upon or otherwise tied to its financial statements that were materially false.

### COUNT XIV

### UNJUST ENRICHMENT OF OFFICER AND DIRECTOR DEFENDANTS WITH RESPECT TO SUBPRIME CLAIMS

241.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

242.    Each of the Subprime Defendants was unjustly enriched by the payments made and/or payable to them as compensation and otherwise by the Company.

243.    Throughout the relevant period, each of the directors among the Subprime Defendants was paid substantial fees for attending meetings and otherwise occupying positions as directors of Fannie Mae.  Similarly, the senior officers of Fannie Mae among the Subprime Defendants were being paid and will be paid substantial salaries and other compensation for their purported services to the Company.  All of such payments and fees were unearned and unjustified since these officers and directors so utterly failed to fulfill their responsibilities for the management and governance of the Company.

244.    Each of the Subprime Defendants not only received and retained the funds unjustly received and invested such funds, thereby receiving additional unjust enrichment.

245.    By their wrongful acts of insider selling, defendants Mudd, Levin, Williams, Lund, Niculescu, Senhauser, Bacon, Knight, Blakely, Kisey or Pickett were unjustly enriched at the expense of and to the detriment of Fannie Mae.

246.    As a result of the foregoing unjust enrichment, each of the Subprime Defendants should be required to repay to Fannie Mae the respective amounts paid plus interest based upon each of these defendants' investment and retention of the proceeds of their unjust enrichment, and to disgorge all other profits, benefits, and compensation obtained by them from their wrongful conduct.

104

## COUNT XV

### BREACH OF CONTRACT BY WAMU AND COUNTRYWIDE
### WITH RESPECT TO SUBPRIME CLAIMS

247.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

248.     The contracts by which WaMu and Countrywide sold loans to Fannie Mae, which plaintiff does not presently have available to attach hereto, either by implication or otherwise included representations and promises by WaMu and Countrywide, respectively, that the value of those loans had been determined by appraisals in compliance with professional and legal standards requiring the independence of appraisers from the lending, investment, and collection functions of a financial institution.   In fact, Countrywide and WaMu controlled the selection and assignment of appraisers to the loans that were ultimately sold to Fannie Mae in violation of these professional and legal standards.

249.     Moreover, in many cases, WaMu, Countrywide and/or their respective loan officers exerted pressure on appraisers to raise the appraised value of a home being used as collateral for a loan above what the appraiser, in his best professional judgment, had determined to be the value of that home.

250.     This conduct by WaMu and Countrywide constitutes a breach of their contracts with Fannie Mae that substantially damaged Fannie Mae in an amount which cannot presently be determined.   Upon information and belief, such conduct by WaMu and Countrywide was known to be occurring by defendants Killinger and Mozilo, respectively, and/or directed by them personally or through subordinates.

251.    Accordingly, plaintiff, on behalf of Fannie Mae and its shareholders, seeks monetary damages from defendants WaMu, Countrywide, Mozilo and Killinger.

### COUNT XVI

### BREACH OF WARRANTY BY WAMU AND COUNTRYWIDE WITH RESPECT TO SUBPRIME CLAIMS

252.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

253.    Fannie Mae requires all lenders from whom it purchases loans to "follow appropriate practices in the property valuation and underwriting processes." Fannie Mae unequivocally emphasizes that "[i]t is essential that a lender obtain an independent, disinterested examination and valuation of the property that secures a mortgage it intends to sell us.... The lender must not attempt to apply pressure or otherwise unduly influence the appraiser to reflect certain results in his or her analysis or reporting."

254.    Most importantly, Fannie Mae makes it clear to all the lenders with whom it does business that it "hold[s] the lender responsible for the accuracy of both the appraisal and its assessment of the marketability of the property." In doing business with any lender, Fannie Mae explicitly relies on the lender to ensure that appraisals are done properly and lawfully, that is, appraisals must be impartial and unbiased. In doing business with Fannie Mae, the "lender is solely accountable for the performance of the appraisers it selects."

255.    Consequently, with each sale of a loan to Fannie Mae, WaMu and Countrywide warranted that the appraisals underlying the loan were in full compliance with USPAP, applicable laws, and Fannie Mae's requirements.

106

256.    In fact, WaMu, Countrywide and their loan officers effectively controlled the selection of appraisers for their originated loans and in other ways manipulated the appraisal process, as described above, in violation of USPAP, applicable laws, and Fannie Mae's requirements. Upon information and belief, such conduct by the subprime facilitators, including the selection of appraisers by WaMu and Countrywide, was known to be occurring by defendants Killinger and Mozilo, respectively, and/or directed by them personally or through subordinates.

257.    These violations of USPAP, applicable laws, and Fannie Mae's requirements governing the appraisal process constituted a breach of warranty by WaMu and Countrywide that has substantially damaged Fannie Mae in an amount which cannot presently be determined.

258.    Accordingly, plaintiff, on behalf of Fannie Mae and its shareholders, seeks monetary damages from defendants WaMu, Countrywide, Mozilo and Killinger.

### COUNT XVII

### CONSPIRACY TO DECEIVE AND DEFRAUD BY WAMU, FIRST AMERICAN, EAPPRAISEIT, COUNTRYWIDE, AND LSI WITH RESPECT TO SUBPRIME CLAIMS

259.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

260.    Upon information and belief, defendants WaMu, First American, and eAppraiseIt on the one hand and Countrywide and LSI on the other, agreed and conspired to allow WaMu and Countrywide loan officers, respectively, to effectively control the selection of appraisers for their originated loans and to manipulate the appraisal process so as to improperly, unprofessionally, and illegally increase the appraised value of the properties that were collateral for WaMu loans sold by it and purchased by Fannie Mae.  Upon information

and belief, such conduct by WaMu, First American, eAppraiseIt, Countrywide and LSI was known to be occurring by defendants Killinger, Merlo and Mozilo, respectively, and/or directed by them personally or through subordinates.

261.    As a result of the purchase of WaMu and Countrywide loans valued through this corrupt appraisal process, Fannie Mae was substantially damaged in an amount which cannot presently be determined.

262.    Accordingly, plaintiff, on behalf of Fannie Mae and its shareholders, seeks monetary damages from subprime facilitators, defendants WaMu, First American, eAppraiseIt, Countrywide and LSI, as well as from defendants Killinger, Merlo and Mozilo.

## COUNT XVIII

### RECKLESS PROVISION OF INFORMATION FOR THE GUIDANCE OF OTHERS BY EAPPRAISEIT, FIRST AMERICAN, AND LSI WITH RESPECT TO SUBPRIME CLAIMS

263.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

264.    Upon information and belief, defendants eAppraiseIt and LSI expressly represented to Fannie Mae that in providing appraisal services they "adhere to all guidelines established by USPAP, FNMA [Fannie Mae], FHLMC, and Federal and State Regulations."

265.    Defendants eAppraiseIt, First American and LSI knew that, with respect to the appraisal services of eAppraiseIt and LSI for defendant WaMu, such representations were not true due to the control over the selection of appraisers and the ability to manipulate the appraisal process eAppraiseIt and LSI had given to WaMu and Countrywide.

266.    Defendant eAppraiseIt expressly represented: "A value-added service eAppraiseIt actively manages appraiser service levels and monitors quality and time sensitive documentation to ensure compliance with standard appraisal practices."

267.    Defendants eAppraiseIt and First American knew that, with respect to eAppraiseIt's appraisal services for WaMu, this representation was not true due to the control over the selection of appraisers and the ability to manipulate the appraisal process eAppraiseIt had given to WaMu.  Upon information and belief, such conduct by eAppraiseIt and First American was known to be occurring by defendant Merlo and/or directed by him personally or through subordinates.

268.    Investors in the secondary mortgage market who purchased WaMu and Countrywide loans, including Fannie Mae, reasonably relied on these various representations that the appraisals underlying WaMu and Countrywide-originated mortgages done by eAppraiseIt and LSI, respectively, were done in compliance with professional guidelines and federal and state laws and regulations, and so were good-faith, competent, and professionally objective appraisals of the value of the collateral for WaMu and Countrywide-originated mortgages.

269.    Defendants eAppraiseIt, First American, Merlo and LSI knew, or should have known, that investors in the secondary mortgage market who purchased WaMu and Countrywide loans, including Fannie Mae, reasonably relied on these representations and the purportedly professionally objective quality of the appraisals of the value of the collateral for WaMu and Countrywide-originated mortgages.

109

270.     Defendants eAppraiseIt, First American, Merlo and LSI surrendered control over the selection of appraisers to WaMu and Countrywide, respectively, and gave WaMu and Countrywide the ability to manipulate the appraisal process in reckless disregard of the ultimate accuracy of the appraisals of the value of the collateral for WaMu and Countrywide-originated mortgages and of the reliance of investors in the secondary mortgage market who purchased WaMu and Countrywide-originated loans, including Fannie Mae, on the accuracy of those appraisals.

271.     As a result of this reckless provision of information for the guidance of others, Fannie Mae was substantially damaged in an amount which cannot presently be determined.

272.     Accordingly, plaintiff, on behalf of Fannie Mae and its shareholders, seeks monetary damages from defendants eAppraiseIt, First American, Merlo and LSI.

## PRAYER FOR RELIEF

Wherefore, plaintiff prays that the Court enter judgment against the defendants:

A.     declaring that the officer and director defendants have breached their fiduciary and other duties owed to Fannie Mae and its shareholders as alleged herein, and further declaring that Goldman Sachs aided and abetted such conduct with respect to the Pre-2005 Claims;

B.     declaring that WaMu, First American, eAppraiseIt, Countrywide and LSI have breached their respective contractual and other duties owed to Fannie Mae and its shareholders as alleged herein and further declaring that defendants Killinger, Merlo and Mozilo actively participated in such conduct;

C.      declaring the election of directors pursuant to the Proxy Statement null and void and ordering that a new election take place pursuant to a proxy statement prepared in accordance with the disclosure and other requirements of the federal securities laws;

D.      directing all defendants, jointly and severally, to account for all losses and damages sustained by Fannie Mae caused by reason of the acts and omissions complained of herein;

E.      awarding Fannie Mae money damages against all defendants, jointly and severally, for all losses and damages sustained and to be sustained by Fannie Mae and its shareholders as a result of the acts, omissions and transactions complained of herein;

F.      directing the Company's officer and director defendants named herein to account for and to remit and disgorge to Fannie Mae all profits and other benefits and unjust enrichment they have obtained and retained as a result of the acts and omissions complained of herein, including all salaries, bonuses, fees, stock awards, options, compensation and common stock sales proceeds together with the earnings upon such amounts by which the such defendants were unjustly enriched and imposing a constructive trust thereon;

G.      ordering that the senior management of Fannie Mae named as defendants herein and those under their supervision and control refrain from further misconduct as alleged herein and to implement corrective measures that will rectify all such wrongs as have been committed and prevent their recurrence;

H.      ordering the Company to take all necessary actions to reform and improve its corporate governance and internal control procedures including, *inter alia*, establishing and implementing effective underwriting standards and accounting for its operations and financial condition in compliance with GAAP;

I.      awarding Fannie Mae pre-judgment and post-judgment interest as allowed by law;

J.      awarding Fannie Mae punitive damages;

K.      awarding disgorgement by defendants Mudd and Levin in favor of Fannie Mae as provided by § 304 of Sarbanes-Oxley;

L.      awarding plaintiff's attorneys' fees, expert fees, consultant fees and other costs and expenses; and

M.      granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a jury trial as to all issues so triable.

June **25**, 2008

**CUNEO GILBERT & LaDUCA, LLP**

JONATHAN W. CUNEO (D.C. Bar# 939389)
ROBERT J. CYNKAR (D.C. Bar# 947845) *957845*
DAVID W. STANLEY (D.C. Bar# 174318)
507 C Street, N.E.
Washington, DC 20002
202-789-3960

**GREENFIELD & GOODMAN, LLC**

RICHARD D. GREENFIELD
MARGUERITE R. GOODMAN
780 Third Avenue - 48th Floor
New York, NY 10017
(410)320-5931

Attorneys for Plaintiff

112

# **VERIFICATION**

**I, L. JAY AGNES, hereby declare and verify as follows:**

**I am the plaintiff in the above-captioned case.  I have read the contents of the foregoing Complaint.  I am informed and believe the matters related therein are true, based upon facts as related to me by my counsel, and on that ground I allege that the matters stated therein are true.**

**L. Jay Agnes**

**June 24, 2008**

# Exhibit A

# GREENFIELD & GOODMAN LLC
## ATTORNEYS AT LAW
**7426 Tour Drive**
**Easton, Maryland 21601**

**(410) 745-4149**
**(410) 745-4158 (Fax)**

Richard D. Greenfield
*Also Admitted to the New York*
*and Pennsylvania Bars*

*e-mail: whitehatrdg@earthlink.net*

November 29, 2007

Fannie Mae
3900 Wisconsin Avenue, N.W.
Washington, DC 20016

**VIA E-MAIL**

Attention: Board of Directors
c/o O'Melveny & Myers, Counsel to Fannie Mae

Dear Members of the Board:

I am writing to you on behalf of Jay Agnes, the continuous owner of 300 shares of the common stock of Fannie Mae ("the Company") from May 8, 1996 to the present. This letter amends and supplements my letter to you on his behalf dated October 3, 2007. With that letter was enclosed an Electronic Broker Book Security Review from Mr. Agnes' broker reflecting such ownership, which continues to the present.

This letter is being sent to you in the context of, *inter alia*, the revelations over the past several years of a massive, multi-year manipulation of Fannie Mae's reported earnings, disclosure of long-continuing mismanagement of it and payment to senior executives of unearned "bonuses" and other compensation.

On behalf of Mr. Agnes, I hereby demand that the Fannie Mae commence legal proceedings to recover its damages from each present and former member of its Board of Directors who held such position at any time since the release of its 1998 and subsequent financial results; those senior officers of Fannie Mae who carried out and/or participated in covering up the plan or scheme referred to below; and all those who aided or abetted the Company's officers and directors in entering into fraudulent transactions and book entries with the Company to facilitate the artificial manipulation of its reported earnings, including, but not limited to, Goldman Sachs Group, Inc. (and/or its subsidiaries, employees, etc.). Each of these claims owned by Fannie Mae are referred to herein as the "Pre-2005 Claims").

As you are additionally aware, Fannie Mae has commenced litigation against its former purportedly independent auditor, KPMG seeking recovery of its damages as outlined below. In that litigation, which is directly related to the Pre-2005 Claims, KPMG has raised the issue of *in pari delicto* in seeking to have such litigation dismissed. To date, such a maneuver has been unsuccessful. This issue, however, may ultimately cause the defeat of Fannie Mae's direct claims against KPMG because, in fact, certain of its present and/or former officers may well be found to have conspired with KPMG and its auditing personnel in carrying out the alleged misrepresentations of Fannie Mae's consolidated financial statements and in other illegal conduct. As such, I further demand that Fannie Mae consent to the intervention of Fannie Mae shareholders James Kellmer and/or Jay Agnes to intervene derivatively in Fannie Mae's direct suit against KPMG to better protect the interests of Fannie Mae and all of its present shareholders.

As you know, as a result of the actions of its officers and directors resulting in the Pre-2005 Claims, Fannie Mae has already sustained substantial damages and continues to be subject to further damages. Those damages include the $400 million fine imposed by OFHEO and the SEC against it, the more than $1 billion spent by Fannie Mae in connection with the restatement of its earnings for multiple years, the more than $10 billion in lost market capitalization, and the massive legal and other expenses of defending against and resolving claims made against Fannie Mae by purchasers of its securities.

Similarly, to the extent that any of the foregoing persons has been unjustly enriched, including KPMG, at the expense of Fannie Mae in connection with the Pre-2005 Claims, I demand that the Fannie Mae commence litigation against them seeking injunctive relief which, *inter alia*, requires them to account to it and repay any such unjust enrichment together with the earnings thereon. Included within such unjust enrichment are the proceeds of the exercise of any stock options by senior officers during the relevant period while in possession of material inside information, as well as any salaries and bonuses received by such senior officers and, in the case of KPMG, fees paid to it, during the relevant period.

I further demand that Fannie Mae terminate for cause all those senior officers implicated in the earnings manipulation scandal leading to the Pre-2005 Claims, including both those still with the Company and those who have been allowed to leave the Company voluntarily, which wrongful actions appear to have commenced some time prior to 1998. Until such time as the Company completes restatement of all of its financial statements for the affected periods through 2005 and becomes a current filer with respect thereto, the wrongdoing is continuing.

As you are well aware, OFHEO's May 2006 report showed not only that Fannie Mae's senior management manipulated the its earnings, but that it did so with the acquiescence of its Board of Directors. OFHEO reported:

- Fannie Mae senior management promoted an image of the [Company] as one of the lowest-risk financial institutions in the world and as "best in class" in terms of risk management, financial reporting, internal control, and corporate governance. The findings in this report show that risks at Fannie Mae were

greatly understated and that the image was false.

- During the period … 1998 to mid-2004 … Fannie Mae reported extremely smooth profit growth and hit announced targets for earnings per share precisely each quarter. Those achievements were illusions deliberately and systematically created by the [Company's] senior management with the aid of inappropriate accounting and improper earnings management.

- A large number of Fannie Mae's accounting policies and practices did not comply with Generally Accepted Accounting Principles (GAAP). The [Company] also had serious problems of internal control, financial reporting, and corporate governance. Those errors resulted in Fannie Mae overstating reported income and capital by a currently estimated $10.6 billion.

- By deliberately and intentionally manipulating accounting to hit earnings targets, senior management maximized the bonuses and other executive compensation they received, at the expense of shareholders….

- Fannie Mae's Board of Directors contributed to those problems by failing to be sufficiently informed and to act independently of its chairman, Franklin Raines, and other senior executives; by failing to exercise the requisite oversight over the [Company's] operations; and by failing to discover or ensure the correction of a wide variety of unsafe and unsound practices.

- The Board's failures continued in the wake of revelations of accounting problems and improper earnings management at Freddie Mac and other high profile firms, the initiation of OFHEO's special examination, and credible allegations of improper earnings management made by an employee of the [Company's] Office of the Controller.

- Fannie Mae senior management sought to interfere with OFHEO's special examination by directing the [Company's] lobbyists to use their ties to 1) generate a Congressional request for the Inspector General of the Department of Housing and Urban Development (HUD) to investigate OFHEO's conduct of the examination and 2) insert into an appropriations bill language that would reduce the agency's appropriations until the Director of OFHEO was replaced.

The corporate governance and management scandal that has engulfed Fannie Mae and each of you leading to the Pre-2005 Claims has, as its genesis, the decision and policies of present and former senior management (acquiesced in by Fannie Mae's Board) to create a "rainy day fund" to manage the Company's reported earnings, a fund not unlike the Nixonian political slush funds that were kept hidden and used for "contingencies," the principal contingency being to even out by artificial means Fannie Mae's reported earnings, and to report sufficiently high earnings to purportedly justify the payment of unearned bonuses and other compensation to the Company's senior executives.

All members of the Board, based upon the information provided to them, specifically knew or should have known that the earnings reported publicly by senior management had been massaged to avoid material variations therein from quarter to quarter and from year to year and to generate unjustified bonuses through 2005.

Indeed, some of the Company's directors, because of their personal levels of accounting and financial expertise, undoubtedly should have known not only that Fannie Mae's reported earnings were manufactured but that the underlying transactions used as part of management's sleight of hand were not *bona fide* and created to deceive the investing public and regulatory agencies.

Notwithstanding the reports that you received on a current basis and other indicia of massive wrongdoing through 2005 which was obvious or should have been obvious to a prudent director, nothing material was done to deal with these issues until the eve of public release of OFHEO's preliminary report, when you appointed a committee of purportedly independent directors to deal with OFHEO and the wrongdoing referred to in its preliminary report. Even then, knowing what you did, and given the varying but universal participation of each of you in the wrongdoing, you put the very wrongdoers in charge of cleaning up the mess, much like putting foxes in charge of the hen house. As such, the money paid to carry out such efforts amounted to a waste of Fannie Mae's corporate assets and, in effect, nothing more than an attempt to keep the truth from being exposed publicly.

As a separate and distinct claim from those referred to in pre-existing derivative litigation and the Pre-2005 Claims generally, during the past several years since the debacle referred to above, Fannie Mae's Board and senior management, in a desperate attempt to recoup earnings which "disappeared" through restatement and otherwise, intentionally or otherwise deviated from the Company's traditional guidelines for the acceptance of mortgage loans and pools and accepted through them and otherwise numerous sub-prime mortgages despite their materially higher risk profile. As a result of such conduct, Fannie Mae has been subjected to massive loan defaults, further overstatement of reported earnings due to having maintained inadequate reserves to cover such potential defaults and has been otherwise harmed, particularly if it cannot successfully be held harmless from loss by the originators of the loans in question.

In addition, to compound Fannie Mae's unjustifiable acceptance of risk, within at least the last 18 months, despite being on notice of the deterioration of the sub-prime mortgage market and real estate values generally, the Company has relied on questionable and, indeed, highly suspect appraisals and evaluations, in acquiring assets and making investments which, had management and the Board been more prudent, would not have been acquired. As a result of the acquisition of these questionable assets and investments and the failure to make adequate disclosure thereof, Fannie Mae has been and is continuing to be damaged in substantial amounts, all of which has been covered up and subjected the Company to an entirely new round of securities fraud litigation and investigations.

The demands made herein and the fact that they have been made should not be taken to mean that any of you is independent or can properly and objectively deal with such demands, which you cannot. Each of you is personally implicated in the alleged wrongdoing by, *inter alia*, your

failure to cause Fannie Mae to appropriately pursue all of its claims arising from the matters referred to herein.  The demands have been made because, if they had not been, your counsel and/or counsel for the Company would seek to have dismissed any shareholder's derivative litigation if a demand had not been made, however futile such a gesture is, as in this case. Indeed, you instructed such legal counsel to do so with respect to other Fannie Mae shareholders who had not made such demands upon you pursuant to Rule 23.1 of the Federal Rules of Civil Procedure.

I look forward to hearing from you or your counsel within thirty days.

Sincerely yours,


Richard D. Greenfield

Enclosure
Cc: Mr. Jay Agnes

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Jay Agnes, Derivatively on Behalf of Fannie Mae, a/k/a Federal National Mortgage Association, and its shareholders and individually, | Franklin D. Raines et al. |

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**    88888
**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Jonathan W. Cuneo
Robert J. Cynkar
Cuneo Gilbert & LaDuca, LLP
507 C Street N.E.
Washington, DC 20002

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

● 3 Federal Question (U.S. Government Not a Party)

○ 2 U.S. Government Defendant

○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

○ **A.** *Antitrust*

☐ 410 Antitrust

○ **B.** *Personal Injury/ Malpractice*

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C.** *Administrative Agency Review*

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D.** *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

● **E.** *General Civil (Other)*    **OR**    ○ **F.** *Pro Se General Civil*

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☒ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding ○ 2 Removed from State Court ○ 3 Remanded from Appellate Court ○ 4 Reinstated or Reopened ○ 5 Transferred from another district (specify) ○ 6 Multi district Litigation ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

Shareholder derivative suit under 12 USC 1452(f) alleging breach of fiduciary duty, etc., & claim for false & misleading proxy statement under 15 USC 78n

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 **DEMAND $** _____ Check YES only if demanded in complaint
**JURY DEMAND:** YES ☒ NO ☐

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☒ NO ☐ If yes, please complete related case form.

DATE  June 23, 2008    SIGNATURE OF ATTORNEY OF RECORD  *Robert J. Cophar*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.